INFORMATION SCIENCES CORP., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Gallagher, Hudson, Hudson & Hunsberger, Inc. (d/b/a Development InfoStructure or DEVIS), Intervenor.

No. 05–1342C.

United States Court of Federal Claims.

Sept. 19, 2006.

argument, the Court will assume, without deciding, that such a relationship did exist.

William A. Shook, Preston Gates Ellis & Rouvelas Meeds, LLP, Washington, D.C., for Plaintiff.

Gregg M. Schwind, United States Department of Justice, Washington, D.C., for Defendant.

Robert S. Ryland, Kirkland & Ellis LLP, Washington, D.C., for Intervenor.

## MEMORANDUM OPINION AND FINAL ORDER*

BRADEN, Judge.

This action was filed by Information Sciences Corporation ("ISC"), an information

---

* On August 31, 2006, a pre-publication draft of the Memorandum Opinion and Final Order was provided under seal to the parties. The parties were instructed to propose any redactions. On Sep-

technology ("IT") provider, to challenge the December 7, 2005 award of the Federal Business Opportunities Contract by the General Services Administration ("GSA") to Symplicity Corporation ("Symplicity"), because GSA allegedly violated federal procurement statutes, regulations, and/or acted without a rational basis. On December 29, 2005, another IT provider, Gallagher, Hudson, Hudson, and Hunsberger, Inc. ("Development InfoStructure" or "DEVIS") also intervened in this action to challenge the award of the contract to Symplicity.

For the reasons discussed herein, the court has determined that GSA has violated certain federal procurement regulations that prejudiced plaintiff and intervenor. As a result, limited injunctive relief is appropriate.

To facilitate review of this Memorandum Opinion and Order, the court has provided the following outline:

I. RELEVANT FACTS. [76]
 A. The Background Of The Procurement. [76]
 B. The May 18, 2004 Request For Proposals No. TQN–04–RA–0001. [77]
 C. The Chronology Of Major Procurement Events. [78]
 D. The June 24, 2004 Competitive Range Determination. [79]
 E. Subsequent Amendments 0004, 0005, 0006. [79]
 F. The General Services Administration's Technical Evaluations Of The Final Proposals. [80]
 1. Technical Evaluations Of The Awardee.
 a. The Majority Report.
 b. The Minority Report.
 c. The Mitretek Systems Inc. Report.
 2. Technical Evaluations Of Plaintiff.
 a. The Majority Report.
 b. The Minority Report.
 c. The Mitretek Systems Inc. Report.
 3. Technical Evaluations Of Intervenor.
 a. The Majority Report.
 b. The Minority Report.
 c. The Mitretek Systems Inc. Report.
 4. Technical Evaluations Of Another Bidder.
 a. The Majority Report.
 b. The Minority Report.
 c. The Mitretek Systems Inc. Report.
 G. The General Services Administration's Price Evaluations Of The Final Proposals. [85]
 1. Price Evaluation Of The Awardee.
 2. Price Evaluation Of Plaintiff.
 3. Price Evaluation Of Intervenor.
 4. Price Evaluation Of Another Bidder.
 H. General Services Administration's Initial "Best Value" Determination. [87]
 1. The May 26, 2005 Determination That Offers From The Awardee And Plaintiff Were Technically Acceptable.
 2. The June 16, 2005 Recommendation For Award.
 3. The June 16, 2005 "Best Value" Determination And June 17, 2005 Award Of Contract To The Awardee.
 I. Post–Award Protests At The Government Accountability Office, Stop Work Order, And Reopening Of The Procurement. [88]
 J. The General Services Administration's Post–Protest "Best Value" Determination. [89]
 1. The December 2, 2005 Determination That The Offers From The Awardee And Plaintiff Technically Were Acceptable.
 2. The December 5, 2005 Recommendation For Award.

tember 19, 2006, this Memorandum Opinion and Final Order was published with redactions, indicated by the designation "[deleted]," and several clarifying editorial changes were made by the court. The non-redacted version was also filed on September 19, 2006 under seal with the Clerk of the United States Court of Federal Claims.

 3. The December 5, 2005 "Best Value" Determination And December 7, 2005 Award To The Awardee.

II. PROCEDURAL HISTORY. [92]

III. DISCUSSION. [92]
 A. Jurisdiction. [92]
 B. Standing. [92]
 1. Plaintiff Has Standing.
 a. As An "Interested Party."
 b. Had A "Substantial Chance" of Being Awarded The Contract.
 2. The Intervenor Has Standing As A Matter Of Right, Pursuant To RCFC 24(a).
 a. The Intervenor's Motion Was Timely.
 b. The Intervenor Has An Interest Relating To The Property Or Transaction At Issue.
 c. The Intervenor's Interest Was Not Adequately Represented By The Parties.
 C. The Relevant Standards For Decision On The Administrative Record In A Bid Protest Case. [95]
 D. The Court's Resolution Of The Parties' Motions For Judgment On The Administrative Record. [98]
 1. Unspecified Actions Of The Office Of Federal Procurement Policy That Were Alleged In Paragraph 23 Of The Amended Complaint Are Dismissed.
 2. The General Services Administration Had Authority To Award The Contract.
 3. The General Services Administration Did Not Violate Federal Acquisition Regulation 15.208(b)(1) (Late Offers).
 4. The General Services Administration Did Not Violate Federal Acquisition Regulation 15.305(a) (Factors Specified In Solicitation).
 5. The General Services Administration's Technical Evaluations Had A Rational Basis.
 a. The General Services Administration's Decision To Increase The Technical Ratings Of ISC And Symplicity Had A Rational Basis.
 b. The General Services Administration's Decision To Direct The Technical Evaluators To Consider Cost As A Technical Factor Had A Rational Basis.
 c. The General Services Administration's Decision That Plaintiff's Elimination Of The Post–IOC Migration Period Was A Technical Weakness Had A Rational Basis.
 d. The General Services Administration's Decision That Plaintiff's Failure To Schedule 'Train–The–Trainer' Classes Was A Technical Weakness Had A Rational Basis.
 e. The General Services Administration's Decision That Plaintiff's Failure To Include Enhancements In CLIN 0001 Was A Technical Weakness And A Management Approach Weakness Had A Rational Basis.
 6. The General Services Administration Did Not Misrepresent Mitretek Inc.'s Technical Assessment Of Plaintiff's Proposal.
 7. The General Services Administration's Price Evaluations That Had A Rational Basis.
 a. The General Services Administration's Evaluation Of Plaintiff's Price Proposal Had a Rational Basis.
 b. The General Services Administration's Evaluation Of Intervenor's Price Proposal Had A Rational Basis.
 8. The General Services Administration Made Other Decisions That Had A Rational Basis.
 a. The General Services Administration's Decision That Plaintiff's Failure To Provide Adequate Outreach Programs Was A Management Approach Weakness Had A Rational Basis.

 b. The General Services Administration's Decision That The Past Experience Of Plaintiff's Proposed Staff Was A Personnel And Staffing Weakness Had A Rational Basis.

 c. The General Services Administration Decision That Awardee's Proposal Warranted A Rating Of "Confident" Had A Rational Basis.

 9. The General Services Administration Did Not Waive Any Mandatory Requirements.

 10. The General Services Administration Did Not Improperly Consider Software Rights In Making A "Best Value" Decision.

 \* \* \*

 11. The General Services Administration Violated Federal Acquisition Regulation 15.306(c) (Competitive Range).

 a. The Contracting Officer Failed To Consider Price In Establishing The Competitive Range.

 b. Plaintiff And The Intervenor Were Prejudiced.

 12. The General Services Administration Violated Federal Acquisition Regulation 15.308 (Comparative Assessment, Independent Judgment, Documentation For Rationale).

 a. The Source Selection Authority Engaged In A Comparative Assessment.

 b. The Source Selection Authority Did Not Exercise Independent Judgment And Document That Exercise.

 c. Plaintiff and Intervenor Were Prejudiced.

 13. The General Services Administration Misrepresented Findings, But The Intervenor Was Not Prejudiced.

 14. The General Services Administration's Decisions That Did Not Have A Rational Basis.

 a. The General Services Administration's Decision That Plaintiff Did Not Provide An Adequate Incentive Structure Did Not Have A Rational Basis.

 b. The General Services Administration's Decision That Plaintiff's Proposed Staffing Was Excessive Did Not Have Rational Basis.

 c. Plaintiff Was Not Prejudiced By These Errors.

 E. Plaintiff And Intervenor Are Entitled To Limited Injunctive Relief. [126]

 1. Plaintiff and Intervenor Have Demonstrated Success On The Merits As To Certain Issues.

 2. Plaintiff and Intervenor Have Established Irreparable Harm, If The Court Does Not Grant Injunctive Relief.

 3. In This Case, A Balance of the Hardships To The Parties Favors The Grant of Limited Injunctive Relief.

 4. In This Case, The Public Interest Weighs in Favor of Limited Injunctive Relief.

IV. CONCLUSION. [129]

## I. RELEVANT FACTS.[1]

### A. The Background Of The Procurement.

FedBizOpps.gov ("FBO") is a website, providing "the single government point-of-entry (GPE) for Federal government procurement opportunities over $25,000." AR 2384. Procuring agencies publicize business opportunities by posting information on FBO. *See* FED.

---

1. The relevant facts discussed herein are derived from: Plaintiff's January 17, 2005 Amended Complaint ("Amend.Compl."); the Administrative Record ("AR" 1–2549), filed on January 20, 2006 and supplemented on February 23, 2006 and April 6, 2006; Intervenor's February 1, 2006 Motion for Judgment on the Administrative Record ("Int.Mot.") and Memorandum in Support ("Int.Mem."); Plaintiff's February 6, 2006 Motion for Judgment on the Administrative Record ("Pl.Mot.") and Plaintiff's Memorandum in Support ("Pl.Mem."); the Government's February 17, 2006 Consolidated Opposition to Plaintiff's and Intervenor's Motions for Judgment on the Administrative Record ("Gov't Opp."); Plaintiff's February 24, 2006 Reply ("Pl.Rep."); Intervenor's February 24, 2006 Reply ("Int.Rep."); the March 1, 2006 Oral Argument ("Tr."); Plaintiff's April 4, 2006 Post–Argument Brief ("Pl.Supp. Br."); Defendant's April 4, 2006 Post–Argument Brief ("Gov't Supp. Br."); Intervenor's April 4, 2006 Post–Argument Brief ("Int.Supp.Br.").

BUS. OPPORTUNITIES, U.S. GEN. SERVS. ADMIN., *available at* http://www.fedbizopps.gov (last visited Aug. 31, 2006). Prospective government contractors can then search, monitor, and retrieve opportunities. The purpose of FBO is to:

> (1) promote the use of cost-effective procedures and processes that employ electronic commerce in the conduct and administration of Federal procurement systems, (2) apply nationally and internationally recognized standards that broaden interoperability and ease the electronic interchange of information, and (3) allow publication of solicitation notices.

AR 2384.

On September 30, 2000, GSA awarded a contract for the original development and maintenance of FBO to Science Applications International Corporation ("SAIC"), who in turn subcontracted to ISC, a small business concern, for "development, design, and maintenance services for the FBO platform and technical environment." AR 2. The final option year of the contract with SAIC was scheduled to expire on September 30, 2004, requiring the Government to award a new contract in order to continue the operation of FBO. *See* AR 87. GSA, however, decided to upgrade the current FBO system: "the offeror may propose a system solution that builds on the current FBO functionality or propose[s] an entirely new system." AR 195; *see also* AR 266 ("The Government requires that the offerors propose innovative solutions.").

**2.** Section L.8.2.1.1 of the Solicitation set forth the minimum technical approach content to be described by all offerors:

> At a minimum, the offeror's technical approach will address the items listed in this section. Describe how your company will assume responsibility for FBO, transition from the current FBO system to your FBO system solution, and how you propose to enhance, operate, and maintain your FBO system solution within the guidelines established in Section B.2 Schedule, Section C Statement of Objectives, Section F.4 Contract Deliverables, and Section H.12 Migration/Transition Of Operations For The New FBO System. Describe your proposals for CLINs [("Contract Line Item Number")] 0002 and 0003. The emphasis of this section should be to convince the Government that your company understands

### B. The May 18, 2004 Request For Proposals No. TQN–04–RA–0001.

On May 18, 2004, GSA issued Request for Proposals No. TQN–04–RA–0001 ("the Solicitation") to award a fixed price incentive contract for the development and management of a new system for the FBO electronic procurement system. *See* AR 86–155. On June 9, 2004, GSA issued Amendment No. 0002 that revised various sections of the May 18, 2004 Solicitation. *See* AR 192–93. The Solicitation, as modified by Amendment 0002, provided for a three-year base contract with five one-year options. *See* AR 196, 206. The Solicitation required an offeror be able to deliver a system that would meet the following minimum capacities:

· Support 2 million registered vendors/users;

· Support 1000 concurrent users;

· Store and archive 1 million + total documents per year;

· Process 60 million + page hits per month;

· Provide live technical and end user support between the hours of 7:00 a.m. to 7:00 p.m., (Eastern Time); and

· Not exceed 8 hours per 12–month period system down time (approximately 99.9% system availability).[2]

*See* AR 200.

The Solicitation identified three Evaluation Factors that GSA would use when making a "best value" determination: a) Technical Proposal; b) Oral Presentation and Operational Capability Demonstration;[3] c) Price;

> the system and business requirements, functionality, and complexities of the FBO system, and have a system solution and program plan to accomplish them. The response must be clear, concise, and specific; statements that your company "understand the requirement and will comply" by themselves are *not satisfactory*—tell us what you will do and how you will do it.
>
> AR 248 (emphasis added).

**3.** The Solicitation explained that the Oral Presentation and Operational Capability Demonstration was a unique Factor in that the presentation and demonstration would be performed after the competitive range was set, and that the Factor was an extension of the Technical Proposal Factor.

and d) Incentive Plan. *See* AR 147, *see also* AR 55, 257, 264. The Solicitation also identified four Subfactors for the Technical Proposal Factor: a) Technical Approach; b) Management Approach; c) Key Personnel Staffing and Experience; d) Past Performance. *Id.* The Solicitation set forth the specific elements that GSA was to consider, giving in equal weight to each Subfactor. *See* AR 259–61. In analyzing the proposals, GSA also was required to assign both an adjectival rating of: "Outstanding," "Excellent," "Acceptable," "Marginal," or "Unacceptable" and a confidence rating of: "High Confidence," "Significant Confidence," "Confidence," "Little Confidence," or "No Confidence." *See* AR 262–63.[4] Likewise, the Solicitation required "fair, reasonable, balanced, and realistic prices," and established a Price Team to perform a price and/or cost analysis to that end. *See* AR 264.

According to the Solicitation, the Technical Proposal Factor was *"significantly* more important" than the Price and Incentive Plan Factors. AR 258 (emphasis added); *see also id.* ("All technical evaluation factors, when combined, are significantly more important than price and incentive plan"). The Solicitation, however, advised that "if technical evaluations are close, [then] the price analysis and incentive plan analysis will take on more importance." AR 258; *see also* AR 55. Of the five Subfactors for the Technical Proposal Factor, Technical Approach was the most

important, followed by Management Approach, Key Personnel Staffing and Experience, and Past Performance. *See* AR 258.

A June 6, 2004 pre-Solicitation document, entitled the Source Selection Evaluation Plan ("SSEP"), stated that a Source Selection Evaluation Board ("SSEB") would "conduct an in-depth review and evaluation of each proposal against the Solicitation requirements and the approved evaluation criteria." AR 36; *see also* AR 33–82. The SSEP also provided that a SSEB Technical Team and a SSEB Price Team would be established and vested with the authority to analyze the technical merits and price of the proposals. *See* AR 35. The SSEP, however, specified that the Source Selection Authority ("SSA") would have the power to *"independently* select[ ]" the offeror that presented the "best value" to the Government. *See* AR 35 (emphasis added). The SSEP also provided that a Contracting Officer ("CO") would be appointed and vested with the authority to make a Competitive Range Determination, pursuant to FAR 15.306(c), serve as chair of the SSEB Technical and Price Teams, and prepare the Source Selection Decision Document for further review and approval by the SSA. *Id.* The Acquisition Council for E–Government ("ACE")[5] appointed the SSA and members of the SSEB. *See* AR 34.

**C. The Chronology Of Major Procure-**

---

4. The Solicitation defined the adjectival rating of "Acceptable," "Marginal," and "Unacceptable" as follows:

 ACCEPTABLE: This proposal meets the minimum performance or capability requirements of any evaluation sub-factors. There may be <u>minor but</u> correctable weaknesses. The offeror has responded to most of the areas under consideration and has provided enough detail to give a general view of what he intends to do and how. Further information may be required from the offeror in order to evaluate his technical effort.

 MARGINAL: The proposal <u>may</u> meet the performance or capability requirements of any evaluation sub-factors. There are apparent or moderate <u>weaknesses that are</u> correctable. The proposal could have been potentially acceptable if some additional work had been done. The proposal lacks clarity and fails to indicate that the capability is present in accordance with the RFP requirements. The pro-

 posal is poorly written and indicates a potentially poor final product.

 UNACCEPTABLE: <u>Fails</u> to meet the performance or capability requirements of any evaluation sub-factors. There are <u>unacceptable</u> weaknesses. The proposal is deficient in a significant number of factors that are not offset with any significant strengths. The proposal is vague, weak, and lacks sufficient detail to evaluate what the offeror is planning. Gross omissions are present and the proposal fails to respond to requirements of major areas of the RFP. This proposal is not technically acceptable.

 AR 262 (underlining in the original).

5. ACE is a multi-function oversight and steering committee that provides review of Integrated Acquisition Environmental ("IAE") initiatives. One of the goals of ACE is to "provide oversight and governance to joint federal acquisition programs and initiatives related to IAE information technology[.]" AR 428.

ment Events.[6]

To facilitate a better understanding of this procurement, a chronology of the significant events follows:

| | |
|---|---|
| June 24, 2004 | GSA received ten timely proposals. |
| July 27, 2004 | Two offerors were eliminated from the competition after a preliminary requirement audit was completed. |
| Sept. 2, 2004 | The competitive range was determined. Four other offerors were eliminated from the competition. The four offerors that remained in the competition were: Aquilent; DEVIS; ISC; and Symplicity. |
| May 26, 2005 | SSA determined that the ISC and Symplicity proposals technically were acceptable. |
| June 16, 2005 | CO issued a Recommendation for Award. |
| June 16, 2005 | SSA completed a Best Value Determination. |
| June 17, 2005 | Contract awarded to Symplicity. |
| June 24, 2005 | ISC and DEVIS filed post-award protests at the Government Accountability Office (Nos. B–295427.3 and B–295427.4, respectively). |
| June 29, 2005 | Stop Work Order sent to Symplicity. |
| July 11, 2005 | Amendment 0007 issued and the procurement evaluations of the four offerors in the competitive range were re-opened. |
| July 25, 2005 | GSA received Price Proposal modifications from DEVIS, but the three other offerors did not submit any changes to their Technical or Price Proposals. |
| Dec. 2, 2005 | SSA determined that the ISC and Symplicity proposals technically were acceptable. |
| Dec. 5, 2005 | CO issued a post-protest recommendation for award. |
| Dec. 5, 2005 | SSA completed the post-protest best value determination. |
| Dec. 7, 2005 | Contract re-awarded to Symplicity. |
| Dec. 22, 2005 | ISC filed a post-award bid protest in the United States Court of Federal Claims (No. 05–1342). |
| Dec. 29, 2005 | DEVIS intervened in ISC's post-award bid protest (No. 05–1342). |

### D. The June 24, 2004 Competitive Range Determination.

By June 24, 2004, GSA received ten timely proposals. *See* AR 1176. Two of the proposals, however, failed to pass the initial requirement audit check and were eliminated from further consideration on July 27, 2004. *Id.*

After the SSEB conducted a preliminary technical evaluation, the CO determined that four offerors were in the competitive range: Aquilent, Inc. ("Aquilent"); DEVIS; ISC; and Symplicity. *See* AR 2486–539; *see also* AR 35 (stating that it is the responsibility of the CO, in accordance with FAR 15.306, to

make the competitive range determination).[7] These four offerors were notified of the CO's determination on September 2, 2004, but given the opportunity to submit a revised proposal by September 20, 2004. *See* AR 1176.

In determining the competitive range, the CO did *not* use proposed prices as a factor:

> Proposed prices were not a factor in determining the competitive range. Due to the performance based nature of this acquisition, proposed solutions varied and therefore prices varied. *A determination, not to eliminate any proposal from the competitive range, based on price, was made by the FBO Contracting Officer.* The Contracting Officer concluded that once the competitive range was determined and technical discussion/price negotiations commenced, offerors could adjust their prices accordingly, which could result in lower prices than initially proposed by each offeror.

\* \* \*

> A cursory review of the ten initial price proposals revealed that not all bidders provided proposals in the format that was requested, and all initial proposals required varying degrees of clarification.

AR 2538 (emphasis added). The Price Evaluation team was "not able to determine realistic pricing from Symplicity for each CLIN [ ("Contract Line Item Number") ] on initial proposals ... we attempted a best guess." AR 2387.[8] Likewise, ISC proposed [deleted], which created ambiguity as to whether the option is [deleted] on the part of ISC. *See* AR 2538.

### E. Subsequent Amendments 0004, 0005, 0006.

Section B.2 of the Solicitation provided that the proposed FBO system must be avail-

---

6. This chronology was derived, in part, from the "Contracting Officer's Summary of Acquisition Process." AR 1175–88.

7. The four recommended proposals all received the adjectival rating of "Acceptable" for each technical subfactor and an overall confidence rating of "Confidence." *See* AR 2537. The four

unsuccessful offerors, however, received numerous "Marginal" and "Unacceptable" ratings. *Id.*

8. The Price Evaluation team estimated Symplicity's proposed price was $918,228.00, which was substantially lower than the $47,110,792.00 average of the other seven bidders. *See* AR 2538.

able for testing by January 10, 2005, and implemented no later than February 6, 2005. *See* AR 195 ("The government requires that offeror's proposed FBO system be fully operational and implemented no later than February 6, 2005. The offeror's proposed FBO system must be operational and available to the government for System Acceptance Test and Evaluation no later than January 10, 2005."). The purpose of these deadlines was to "ensure continuity of operations during system transition ... [and] provide a seamless transition between the current contractor's FBO system and the offeror's FBO system[.]" AR 217. On October 29, 2004, however, GSA issued Amendment 0004, removing the January 10, 2005 and February 6, 2005 deadlines from Sections B.2, C.6, H.12, and L.8.2.1.4 of the Solicitation. *See* AR 566–67 (stating that all references to January 10 and February 6 be replaced with the FBO System Transition Plan found in Attachment J.7.18, thereby eliminating the requirement that the FBO system be fully operational at an early and defined date).

In response to Amendment 0004, ISC filed a pre-award protest at the Government Accountability Office ("GAO") on November 15, 2004. ISC alleged that the elimination of the mandatory dates for delivery of a compliant system meant that the price team could not account for the cost savings associated with an early delivery. *See* Amend. Compl. ¶ 8; *see also* AR 1062. To remedy ISC's concerns, GSA issued Amendments 0005 and 0006, collectively requiring offerors to ensure that their proposed FBO system be operational and available for testing 120 calendar days after the contract award and fully implemented 150 calendar days after the contract award. *See* AR 552–53, 604; *see also* AR 1062. Amendment 0006 also modified Section M.6, incorporating any savings associated with early implementation into the price analysis. *See* AR 605 ("Price of each CLIN will be evaluated by the Price Evalua-

tion team for the following: total life cycle for development, the base operation and maintenance period, option period[,] and transition costs (e.g. *savings* associated with early implementation)." (emphasis added)). In addition, Amendment 0006 extended the deadline for proposal submissions to January 3, 2005. *See* AR 606.

## F. The General Services Administration's Technical Evaluations Of The Final Proposals.

On January 3, 2005, GSA received Final Proposals from the four offerors in the competitive range. *See* AR 1178. After reviewing these proposals, the SSEB Technical Team decided that it was necessary to request written clarifications from the offerors. *Id.* Thereafter, each offeror submitted responses on February 2, 2005. *Id.* In their responses, ISC and Symplicity made changes to their Price Proposals. *Id.* The Technical Evaluators analyzed the proposals and provided evaluation reports to the CO and SSA on April 8, 2005. *Id.; see also* AR 1037 ("[T]echnical reports ... were provided to the Contracting Officer and the Source Selection Authority[.]").

Pursuant to the SSEP, the SSEB issued both a Majority Report and a Minority Report. *See* AR 61 ("If there is ... a significant difference of opinion between members of the evaluation panel, a minority opinion should be issued.... Minority opinions SHALL be made part of the evaluation reports.").[9] The SSEP also designated an independent contractor, Mitretek Systems Inc. ("Mitretek") as an unaffiliated technical advisor. *See* AR 46. On February 13, 2005, Mitretek submitted a technical evaluation report directly to the SSA. *See* AR 1065; *see also* AR 668–744.

The overall technical ratings for each offeror are summarized below:

---

9. Five members of the SSEB joined the Majority Report, while two members of the SSEB joined the Minority Report. *See* AR 1037; *see also* AR 773, 812, 846.

| | MAJORITY REPORT | | MINORITY REPORT | | MITRETEK REPORT | |
| --- | --- | --- | --- | --- | --- | --- |
| | Adjectival Rating | Confidence Rating | Adjectival Rating | Confidence Rating | Adjectival Rating | Confidence Rating [10] |
| Symplicity | Unacceptable | Little Confidence | Acceptable | Confidence | Acceptable | N/A |
| ISC | Marginal | Confidence | Acceptable | Confidence | Acceptable | N/A |
| DEVIS | Excellent | Significant Confidence | Excellent | Significant Confidence | Excellent | N/A |
| Aquilent | Marginal | Little Confidence | Marginal | Little Confidence | Marginal | N/A |

See AR 1066, 1182.

### 1. Technical Evaluations Of The Awardee.

#### a. The Majority Report.

In the Majority Report, Symplicity was assigned an adjectival rating of "Unacceptable" and a confidence rating of "Little Confidence." *See* AR 813. The Majority Report summarized Symplicity's Proposal as follows: "The amount of resources to adequately manage and provide transition, maintenance, and support has been *grossly* underestimated by Symplicity and presents a *significant* risk of unsuccessful contract performance." *Id.* (emphasis added). Underlying the Majority Report's critique of Symplicity's plan was the observation that Symplicity underestimated the amount of human resources required to complete performance. *See* AR 813–37.

The Majority Report documented several weaknesses and a few strengths under the "Technical Approach" Subfactor. *See* AR 815–31. For example, the Majority Report observed that Symplicity failed to propose a technical solution for handling the Central Contractor Registration ("CCR") exemptions to the FAR requirements and did not propose to integrate CCR information into the FBO system during the first 12 months of performance. *See* AR 815–16.[11] The Majority Report also was concerned that Symplicity made "a number of unrealistic assumptions in their proposal ... [which] suggest there could be numerous instances where Symplicity will claim that various issues are

out of scope as its proposal assumed they did not exist." AR 818. Regarding Symplicity's transition plan, the Majority Report explained that, "Symplicity appears not to have proposed the needed level of outreach for its seamless system transition.... [T]he labor hours proposed do not appear to be adequately [sic] to support the level of activity Symplicity is proposing for ongoing outreach and training." AR 829–30.

Assessing the Management Approach Subfactor, the Majority Report concluded that:

Symplicity's proposed hours for labor over the entire 8–year project, cause concern about the level of effort forecasted by Symplicity. Minimal amounts of labor hours are proposed over the duration of the contract and they seem severely underestimated. First, Symplicity is proposing to migrate data with a System Engineer working only 120 hours in year one. This seems low considering the complexities necessary for a conversion the size of FBO[.] ... Secondly, Symplicity is only proposing 90 hours for demonstration and training. This does not seem realistic since their technical approach includes the development of flash movies on the website for users to understand the new application.... Finally, Symplicity is proposing a total of 220 hours for Business Process Analysis, which seems unrealistic.

\* \* \*

Based on the analysis of the labor hours proposed[,] Symplicity's management ap-

---

10. The Mitretek Report did not make a confidence rating. *See* AR 668–744.

11. Although Symplicity's Proposal stated that Symplicity "can provide whatever functionality is required," the Majority Report was not persuaded, because Section L.8.2.1.2 of the Solicita-

tion required a response to be "clear, concise, and specific; statements that your company 'understands the requirements and will comply' by themselves are *not* satisfactory." AR 815–16 (quoting AR 248 (emphasis added)).

proach could put the government at risk for increased costs over the life of the contract.

AR 831–32 (footnotes omitted).

In evaluating the "Past Performance" Subfactor, the Majority Report acknowledged that Symplicity received favorable reviews from past customers, but was concerned that the "[r]eferences do not appear to be similar projects nor were they of the same complexity and size compared to FBO; dollar values are small—largest was around 800K." AR 835.

In evaluating the "Key Personnel Staffing and Experience" Subfactor, the Majority Report also identified concerns about a possible staffing shortage. *See* AR 835–37.

### b. The Minority Report.

The Minority Report assigned Symplicity an adjectival rating of "Acceptable" and a confidence rating of "Confidence." *See* AR 1037; *see also* AR 929–1000. Responding to the Majority Report's concern that Symplicity did not understand the CCR exemption to the FAR requirements, the Minority Report rationalized that "[d]emonstrating any knowledge of FBO subject areas is a plus. Symplicity will require customer involvement during its proposed Business Process Analysis in order to develop business rule processing for … LRAR and this is a perfectly legitimate and acceptable approach." AR 933 (emphasis omitted) (quoting the Solicitation, Section E.3: "The Government Contracting Officer's Technical Representative (COTR) may provide technical direction and general guidance to the Contractor and key resource personnel."). Therefore, the Minority Report concluded that Symplicity's Proposal regarding CCR exemptions met the Solicitation's minimal requirements, because Symplicity "do[es] not know the answer. They need government involvement in shaping the solution. This is perfectly acceptable." AR 934 (emphasis omitted) (applying Section E.3 of the Solicitation).[12] The Minority Report also explained that "[e]xpecting the awardee to op-

erate in an informational vacuum without providing direction or input, is unrealistic and is not how federal contracts are technically managed." AR 937–38.

Regarding the "unrealistic" assumptions that the Majority Report found objectionable. The Minority Report explained that the Government "requires a firm fixed price contract" and, therefore, Symplicity identified a number of assumptions to "provid[e] a more realistic offer by setting limits and boundaries rather than offering the risk associated with an open-ended commitment." *Id.* (emphasis omitted). The Minority Report also pointed out that "[e]very offeror within the competitive range has identified a similar list of assumptions." AR 945–46.

With regard to the staffing problem identified in the Majority Report, the Minority Report agreed: "The weakness about Symplicity having enough staff to carry out planned activity is considered to have merit. However, the severity of this weakness is subject to interpretation and is *still* considered to be within the range of acceptable." AR 972 (emphasis added & omitted); *see also* AR 963 (observing that Symplicity's planned activities are understaffed); AR 975 ("[T]he Minority opinion-holders believe that the aggregate hours available are the absolute minimum to support Symplicity's planned approach. It is possible that they have understated their proposed hours." (emphasis omitted)); AR 986 (stating the same); AR 976 (stating the same and reporting that Symplicity's proposed hours for labor over the entire 8–year project cause concern about the level of effort forecasted by Symplicity). To summarize, the Minority Report agreed with the Majority Report's general assessment that Symplicity understated the amount of labor required to complete performance, but nevertheless concluded that Symplicity's proposal still fell within the acceptable range.

### c. The Mitretek Systems Inc. Report.

In the Mitretek Report, Symplicity was assigned an adjectival rating of "Acceptable."

12. The Minority Report also noted "Symplicity provides considerable analysis about the possible functionality that will become part of the CCR exception processing rules" and that "Symplicity demonstrates a willingness and openness to work with its customer on the 'FBO initiative' to achieve 'whatever functionality is required[.]'" AR 935.

*See* AR 719. The Mitretek Report also concluded that any technical weaknesses in the Symplicity Proposal were "correctable." *Id.; see also* AR 724–44. Consistent with the Majority and Minority Reports, the Mitretek Report acknowledged that the proposal does not identify sufficient labor for training and outreach, "proposes FBO with very little staff support," and has "probably proposed the minimum feasible staffing." AR 719–20.

### 2. Technical Evaluations Of Plaintiff.

#### a. The Majority Report.

In the Majority Report, ISC was assigned an adjectival rating of "Marginal" and a confidence rating of "Little Confidence." *See* AR 774; *but see* AR 1037 (May 26, 2005 Determination that Proposals from Two Offerors be Considered Technically Acceptable: stating that ISC's majority confidence Rating was "Confidence"); AR 1189 (Dec. 2, 2005 Determination that Proposals from Two Offerors be Considered Technically Acceptable: stating the same). Summarizing ISC's plan, the Majority Report stated:

ISC proposes an implementation of a new FBO that is in effect a maintenance release of the current FBO. ISC's technical proposal continually referenced their previous history and prior acknowledgments of the system since inception and describes minimal additional application functionality as part of the new FBO. These references to its past performance constitute the core of ISC's contention that the current FBO system should be retained, with some enhancement, along with ISC.

AR 775–76.

The Majority Report also gave weight to ISC's familiarity with the existing FBO system, as the subcontractor for the incumbent contractor was a "Technical Approach" Subfactor strength, and ISC was aware of the objectives and performance goals required by the Government. *See* AR 776–77; *see also* AR 792 ("ISC has demonstrated that they are the developer and owner of the [current FBO] software, which gives confidence that they know the application thoroughly which includes, install, operate, and update and

maintain the application."). The Majority Report, however, conceded that ISC's Proposal evolved over the course of the Solicitation, creating an inconsistency between ISC's Price and Technical Proposals. *See* AR 779. When asked by GSA to clarify, ISC responded with a letter that the Majority Report considered to be "vague and inconclusive." *Id.; see also* AR 781–83 ("ISC's proposed technical approach conflicts with their Business Proposal.... ISC's response was vague and inconclusive.... The Government requested further clarification of what those reports would included [sic] and ISC's response . . . NEVER answers the question.").

In evaluating the "Management Approach" Subfactor, the Majority Report, however, was satisfied with ISC's reliance on existing technology: "The proposed software development lifecycle appears to be a reformulation of the classic waterfall method, which has been in use for over 25 years. This model has known deficiencies and is not well adapted to web development projects." AR 795. The Majority Report concluded that "although rigid, the waterfall method is popular and describes a development method that is linear, sequential, and easy to understand." *Id.*

In evaluating the "Past Performance" Subfactor, the Majority Report was concerned that "projects for which ISC was the prime contractor were much smaller than the envisioned new FBO contract." AR 800. In addition, a problem with the existing FBO help desk, was categorized as a weakness. *See* AR 799 ("One person indicated difficulty in having the FBO Help Desk handle problems before referring them to agency administrators.").

#### b. The Minority Report.

The Minority Report assigned ISC an adjectival rating of "Acceptable" and a confidence rating of "Confidence." *See* AR 1066. Addressing the inconsistency between the Price and Technical Proposals identified by the Majority Report, the Minority Report explained:

Because the personalization features within 'MyFBO' are much more commonplace in today's web applications, and the need

for these features to be part of FBO was recently recognized in an internal GSA Inspectors General Report, it is in the government's best interest to consider this functionality as being part of ISC's new-FBO offering[.] ... Assessing from this perspective virtually eliminates the Majority identified inconsistency, neutralizes this identified weakness, and permits this offer to be evaluated on a more level basis with others in the competitive range.

AR 882 (footnote omitted).

The Minority Report also described the Majority Report's concern about ISC's reliance on the waterfall method as "at most a mild weakness," explaining that the proposed waterfall method is acceptable, because ISC does not have a significant amount of remaining lines of code to develop. AR 906 (emphasis omitted).

Regarding the "Past Performance" Subfactor, the Minority Report rebutted the Majority Report's classification that one person's complaint with the help desk was a weakness: "One person expressing difficulty about a system as visible and heavily used as FBO over seven years is not a weakness! The [M]inority interprets it as a *significant strength.*" AR 908 (emphasis added and omitted).

### c. The Mitretek Systems Inc. Report.

The Mitretek Report assigned ISC an adjectival rating of "Acceptable." *See* AR 1066, 1090. Mitretek concluded that ISC's reliance on the current FBO system was problematic. AR 689; *see also id.* ("ISC was in the perfect position to identify weaknesses in the existing FBO and propose improvements since it has the advantage of knowledge of what the current system users have been requesting. Instead of leveraging this advantage, ISC has ... proposed to satisfy IOC with the current system functionality which is an inherent deficiency.").

### 3. Technical Evaluations Of Intervenor.

### a. The Majority Report.

The Majority Report assigned DEVIS an adjectival rating of "Excellent" and a confi-

dence rating of "Significant Confidence." *See* AR 745. Summarizing DEVIS' Proposal, the Majority Report explained that, "Devis's proposal demonstrated a strong technical approach and was well thought out and presented." *Id.*

The Majority Report analyzed each element of the "Technical Approach" Subfactor and documented the various strengths, weaknesses, and risks associated with the offer. *See* AR 747–57. Within the seven elements, the Majority Report identified one ostensible weakness, *i.e.*, DEVIS' assumption that "early involvement of interested agencies for 'acceptance' of the new FBO authority to operate ... will lead to an expedited approval by the interested agencies." AR 753; *see also* AR 747–57. In contrast, the Majority Report identified numerous strengths across the seven elements, including DEVIS' "ability to meet the performance goals [and] objectives," and DEVIS "exceed[ing] the cited requirements in a conceptual framework, allowing growth and improvement in an effective system solution[.]" AR 748; *see also* AR 747–57.

The Majority Report identified one weakness in the "Management Approach" Subfactor, namely that DEVIS did not have Capability Maturity Model ("CMM") certifications. *See* AR 760; *see also* AR 757–60. The Majority Report, however, noted that "Devis's management methodology is ... compliant with the American National Standards Institute (ANSI), Institute for Electrical and Electronic Engineers (IEEE), and Program Management Institute (PMI)." AR 760. The Majority Report further stated that DEVIS, "provides confidence that the [proposed] system [will] be[ ]managed at optimum performance[.]" AR 758.

In assessing the "Past Performance" Subfactor, the Majority Report discussed that "Devis has received affirmative comments from respondents where they delivered successful solutions[, the USAID's Trail Net Project,] *of a similar nature* and have met customer's expectations." AR 761 (emphasis added). Since all of the feedback to the SSEB was positive, the Majority Report concluded that DEVIS easily met the minimum

requirements of the "Past Performance" Subfactor. *See* 760–61.

In evaluating the "Key Personnel Staffing and Experience" Subfactor, the Majority Report concluded that "Devis has demonstrated through their proposed key personnel . . . a good understanding of the FBO program and objectives." AR 762. The Majority Report did not identify any weaknesses or risks for this Subfactor. *See* AR 762–63.

### b. The Minority Report.

The Minority Report assigned DEVIS an adjectival rating of "Excellent" and a confidence rating of "Significant Confidence." *See* AR 1064. The Minority Report, however, took exception to the weaknesses identified in the Majority Report, noting that DEVIS "provided an **excellent** description of its technical approach to meet its proposed performance goals, objectives, and outcomes of the new FBO that is consistent within its proposed management approach and addresses items within the RFP and the attachments." AR 848–49, 855 (emphasis in the original).

### c. The Mitretek Systems Inc. Report.

The Mitretek Report assigned DEVIS an adjectival rating of "Excellent." *See* AR 668. Mitretek recommended that DEVIS' Proposal "should be characterized as Excellent moving into the best value analysis. Devis has combined an effective management approach with a solid technical proposal in a manner that makes this proposal very attractive. There are several negative issues to be considered, none of which is major from an execution standpoint. Numerous advantages have been identified; the weaknesses cited are minor." *Id.*

### 4. Technical Evaluations Of Another Bidder.

### a. The Majority Report.

The Majority Report assigned Aquilent an adjectival rating of "Marginal" and a confidence rating of "Little Confidence." *See* AR 1066. The Administrative Record, however, does not contain the full text of the Majority's assessment of Aquilent's Proposal.

### b. The Minority Report.

The Minority Report assigned Aquilent an adjectival rating of "Marginal" and a confidence rating of "Little Confidence." *Id.* The Administrative Record, however, does not contain the full text of the Minority's assessment of Aquilent's Proposal.

### c. The Mitretek Systems Inc. Report.

The Mitretek Report assigned Aquilent an adjectival rating of "Marginal." *Id.* The Administrative Record, however, does not contain the full text of Mitretek's assessment of Aquilent's Proposal.

### G. The General Services Administration's Price Evaluations Of The Final Proposals.

On February 11, 2005, the SSEB Price Team ("Price Team") issued a document to the SSA that detailed the Price Team's evaluation of the four offerors found to be in the competitive range. *See* AR 2383–2429; *see also* AR 1064 ("The Price Analysis, dated February 11, 2005, was provided to the SAA under separate cover."). Section M of the Solicitation required the Government to evaluate the Price Proposals "for realistic and reasonable price proposal/information that indicates compatibility of the proposed prices with the proposed scope and effort." AR 264 ("To ensure fair, reasonable, balanced, and *realistic* prices, the Government will perform a price analysis." (emphasis added)). The Price Team explained that their price evaluations "focus[ed] on the realism of the proposed prices *as a whole* for the scope and nature of the solution/services proposed." AR 2387 (emphasis in the original) ("All proposed prices were subject to price and/or cost analysis").

The original ten offerors provided initial price submissions to the Government on June 24, 2004. *Id.* The initial submissions, however, contained numerous ambiguities and "not all of the bidders provided pricing proposals in the format requested." AR 2387 (noting that it was impossible to determine realistic

pricing from Symplicity for each CLIN and that some of the other proposals did not specify how they would account for equipment and hosting expenses). The Price Team, therefore, compiled a list of questions that were sent out to each of the four offerors in the competitive range, to afford them the opportunity to revise their original Pricing Proposals. *See* AR 2388 (stating that the Government received second, more detailed, price proposals on September 20, 2004). On January 3, 2005, Aquilent and DEVIS submitted their final Price Proposals. *See* AR 2408–09. On February 8, 2005, ISC and Symplicity submitted their final Price Proposals. *See* AR 2410–11.

The offerors' final price submissions were as follows:

| Offeror | Price |
|---------|-------|
| DEVIS | [deleted] |
| Symplicity | [deleted] |
| ISC | [deleted] |
| Aquilent | [deleted] |

*See* AR 2408–11.

### 1. Price Evaluation Of The Awardee.

Symplicity's final Price Proposal was [deleted]. *See* AR 2411. Acknowledging that Symplicity proposed a significantly lower proposed price, the Price Team explained: "Symplicity proposed a totally *automated* approach that offers the Government a substantial reduction of operating costs." AR 2402 (emphasis added). Like the DEVIS Price Proposal, all of Symplicity's proposed labor rates, with the exception of the Data Entry Specialist, were lower than the comparable rates published by the GSA schedule. *See* AR 2402 (stating that, because of these lower rates, Symplicity's Price Proposal for Direct Labor Rates is "fair and reasonable"). The Price Team also concluded that Symplicity's Price Proposal for Web Hosting was fair and reasonable, since it was only "slightly higher" than the fair and reasonable price obtained from the Sprint FTS 2001/Crossover Contract. AR 2403 (comparing the Symplicity

Price Proposal prices obtained from Sprint on a comparable web hosting project). The Price Team also concluded that Symplicity's Price Proposal for hardware is fair and reasonable, because their Proposal has "inherent economic efficiencies" that "allows Symplicity to acquire system hardware without a significant initial onset of cost and [deleted] [.]" AR 2404. Symplicity, therefore, was able to propose reduced costs for hardware that were both fair and reasonable. *Id.*

### 2. Price Evaluation Of Plaintiff.

ISC's final Price Proposal was [deleted]. *See* AR 2410. The Price Team concluded that ISC's Price Proposal for direct labor rates was fair and reasonable, because the proposed rates were [deleted]. *See* AR 2399. The Price Team also concluded that the ISC Price Proposal for Web Hosting as a whole was fair and reasonable, because it was [deleted]. *See* AR 2400 (comparing the ISC Price Proposal with prices obtained from Qwest and AT & T). The Price Team further provided that ISC's proposed software and hardware costs were fair and reasonable upon a favorable comparison with [deleted]. *See* AR 2401.

### 3. Price Evaluation Of Intervenor.

DEVIS' final Price Proposal was [deleted]. *See* AR 2409. The Price Team concluded that the "price proposal for [DEVIS'] Direct Labor Rates is fair and reasonable," because DEVIS' "proposed rates were lower than the published rates on the GSA schedule[.]" [13] AR 2396 (emphasis omitted). The Price Team also concluded that the DEVIS Price Proposals for software and hardware were fair and reasonable, since they were comparable to GSA Advantage pricing schedule. *See* AR 2398. In addition, the Price Team concluded that DEVIS' Price Proposal for Web Hosting, software, hardware, and other direct costs were all fair and reasonable, because they were less than another IT developer charged on a comparable project. *See* AR 2397–98 (comparing the DEVIS

---

13. For example, DEVIS' proposed rate for the Program Director was [deleted] compared to the GSA schedule rate of $144.74/hour; DEVIS' proposed rate for the Task Manager was [deleted]

compared to the GSA schedule rate of $133.02/ hour. *See* AR 2396 (reviewing the price differences between DEVIS and the schedule rate of GSA for various senior staffing positions).

Price Proposal with a Qwest on the FTS2001/Crossover price list).

### 4. Price Evaluation Another Bidder.

Aquilent's final Price Proposal was [deleted]. *See* AR 2408. The Price Team concluded that Aquilent's Price Proposal for Web Hosting was neither fair nor reasonable, since the annual prices in the Aquilent Price Proposal were "much higher" than the GSA schedule. AR 2395.

### H. The General Services Administration's Initial "Best Value" Determination.

#### 1. The May 26, 2005 Determination That Offers From The Awardee And Plaintiff Were Technically Acceptable.

On May 26, 2005, the SSA issued a document entitled, "Determination that Proposals Received from Two Offerors be Considered Technically Acceptable." *See* AR 1037–45; *but see* AR 1057 (June 3, 2005 Award Briefing: "Contracting Officer (CO) *provided* a Determination & Finding to the SSA that proposals from Symplicity and ISC are technically Acceptable[.] ... SSA *concurred* that the Symplicity and ISC proposals are technically Acceptable." (emphasis added)).

In that document, the SSA explained that, "[t]he Final Technical Reports associated with the Aquilent and Devis proposals will not be discussed as part of this Determination and Findings." AR 1038 (emphasis omitted).[14] The SSA then briefly summarized the specific technical evaluations for ISC and Symplicity, and restated verbatim selections of the Minority's rebuttal to the Majority Report. *Compare* AR 1038–45, *with* AR 929–1000.[15] The SSA, however, miscategorized the confidence rating associated with the ISC Proposal and the adjectival rating associated with the Symplicity Proposal.[16]

After a seven-page recapitulation of the Minority Report assessment, the SSA concluded with a brief one-sentence determination that both the Symplicity and ISC Proposals were technically acceptable:

> The SSA, after a review of the minority opinion reports and the independent technical advisor's assessment, agrees with the minority reports and their criticisms of the majority report, and that the proposals received from ISC Corporation and Symplicity Corporation be considered acceptable.

AR 1045 (italics omitted).

#### 2. The June 16, 2005 Recommendation For Award.

Following the determination that Symplicity and ISC's offers were technically acceptable, the CO prepared on June 16, 2004 a "Recommendation for Award," in which the SSA concurred. *See* AR 1088–91; *but see*

---

14. The Minority Report agreed with the Majority Report's technical assessment of the DEVIS Proposal. *See* AR 1037. Thus, DEVIS' Proposal was *already* considered "Acceptable," since DEVIS received a consensus rating of "Excellent" from all evaluators; consequently, the SSA did not have to "bump up" DEVIS' rating in a preliminary document. *Id.*

15. For example, the May 26, 2005 Determination provided: "It is reasonable for Symplicity to identify assumptions. In doing so, Symplicity is providing a more realistic offer by setting limits and boundaries rather than offering the risk associated with an open ended commitment." AR 1044; *compare id., with* AR 945 ("It is reasonable for Symplicity to identify assumptions. In doing so, Symplicity is providing a more realistic offer by setting limits and boundaries rather than offering the risk associated with an open ended commitment." (emphasis omitted)); *compare* AR 1045 ("Symplicity's staffing approach to propose both technical and user interface leads as 'key' in

lieu of a Database Developer/Administrator, is allowable and acceptable."), *with* AR 988 ("Symplicity's staffing approach to propose both technical and user interface leads as 'key' in lieu of a Database Developer/Administrator, is allowable and acceptable.").

16. The SSA provided: "Despite the 'marginal' rating given to [ISC's] proposal by the majority opinion holders, the *entire* technical evaluation team agreed to a confidence rating of 'Confident.'" AR 1038 (emphasis added); *but see* AR 774 ("The consensus Technical Rating is 'Marginal' with *'Little Confidence.'*" (emphasis added)). Summarizing the technical evaluations of the Symplicity Proposal, the SSA explained: "Although the minority opinion also addressees the differences of opinion regarding Technical Evaluation Factors 2 through 4 ... *all* evaluators agree on the rating of *'acceptable'* for these evaluation factors." AR 1042 (emphasis added); *but see* AR 813 ("The consensus *Technical Rating* is *'Unacceptable* [.]'" (emphasis added)).

AR 1082, 1085 (suggesting that this document was drafted as early as June 7, 2005, because the document is attached to the CO's June 7, 2005 Summary of the Acquisition Process). In the Recommendation for Award the CO stated:

I recommend award to Symplicity Corporation, whose offer provides the best overall value to satisfy the government's need. This decision is based upon *careful* review of the factors and subfactors identified within the Solicitation, and comparison of the strengths, weaknesses, and risks that were documented in the technical and price evaluations reports. This memorandum *documents* the basis for my decision.

AR 1088 (emphasis added).

The remainder of the Recommendation for Award, however, merely reiterates the Solicitation's requirements, the final Price Proposals, and the various technical assessments, without any analysis. *See* AR 1088–90 (restating the technical findings and estimated costs). After summarizing the requirements, the CO concluded: "I recommend award to Symplicity Corporation, whose offer provides the best overall value to satisfy the government's need." AR 1091.

### 3. The June 16, 2005 "Best Value" Determination And June 17, 2005 Award Of Contract To The Awardee.

The same day that the CO's Recommendation was issued, a document titled "Best Value Determination" was issued and signed by the SSA and the CO.[17] *See* AR 1092; *but see* AR 1075, 1085 (suggesting that this document was drafted as early as June 7, 2005, because the document is attached to the CO's June 7, 2005 Summary of the Acquisition Process). The Determination emphasized

that "the perceived benefits of higher priced proposals will not offset the lowest priced offer from Symplicity[.]" AR 1092.

The SSA and CO then listed the various Technical Proposal strengths for each of the three offerors that were deemed to be within the acceptable range.[18] *See* AR 1093–97. The SSA and CO, however, failed to mention or analyze any of the weaknesses associated with the three Technical Proposals. *See* AR 1094–97. The SSA and CO also explained the cost savings associated with early implementation, pursuant to Amendment 0006. *See* AR 1098–1107. Finally, the SSA and CO concluded:

For [DEVIS], it is determined that the savings associated with its proposed earlier transition ([deleted]) (total evaluated price of [deleted]), and other perceived benefits of its higher priced proposal, *does not offset the lowest priced, technically "acceptable" offer from Symplicity.*

\* \* \*

ISC's proposed price of [deleted], and the savings of [deleted] associated with early implementation (total evaluated price of [deleted]), along with other perceived benefits of its higher priced proposal, *does not offset the lowest priced, technically "acceptable" offer from Symplicity.*

AR 1106 (emphasis added).

On June 17, 2005, GSA awarded the Contract No. GS00T05NSC0002 to Symplicity. *See* AR 1109.

### I. Post–Award Protests At The Government Accountability Office, Stop Work Order, And Reopening Of The Procurement.

On June 24, 2005, ISC filed a post-award protest at GAO (No. B–295427.3), alleging

---

**17.** There is ambiguity in the record as to whether the "Best Value Determination" was prepared by the CO or SSA. There is substantial evidence in the record that the "Best Value Determination" was part of the overall Recommendation for Award document. Both were issued on the same date. Moreover, the pages of the "Best Value Determination" all state "Attachment 1 to Recommendation for Award." AR 1092–107. In addition, the June 3, 2005 award briefing indicates that the CO "made a second Determination & Finding that the perceived benefits of the high-

er priced acceptable proposals will not offset the lowest priced offer in the context of the Best Value Tradeoff Process[.]" AR 1058.

**18.** DEVIS' Proposal was rated "Excellent" and within the acceptable range by the Majority Report, the Minority Report, and the Mitretek Report. *See* AR 1093. ISC's and Symplicity's Proposals, however, were not within the acceptable range, until the SSA made that determination on May 26, 2005. *See* AR 1037–45.

defects with the evaluation and procurement process. *See* Amend. Compl. ¶ 9 (stating nine alleged defects); *see also* AR 1179. On the same day, DEVIS also filed a post-award protest at GAO (No. B–295427.4) alleging that it was the only offeror that responded to the requirement to price Supplemental Security Services. *See* AR 1179. The Government responded by sending a Stop Work Order to Symplicity and issuing Amendment 0007. *See* AR 1143–50, 1179. Amendment 0007 addressed the security concerns raised in DEVIS' protest, but explicitly stated, "You are given an opportunity to revise your Final Technical Proposal (Volume I) and your Final Price Proposal (Volume II), *only as it pertains to the changes made to Attachment J. 7.1 'Information Security Requirements* [.]' "[19] AR 1150 (certain emphasis omitted and added); *see also* AR 1154 ("GSA will not consider *any* changes to the final proposals that do not relate to the removal of the supplemental security services requirement." (emphasis added)). Based on GSA's corrective action, GAO dismissed both protests on July 24, 2005. *See* AR 1180.

In response to Amendment 0007, DEVIS issued a revised Proposal that was forwarded to GSA on July 25, 2005. *See* AR 1226–28; *but see* AR 1180 ("No changes to [DEVIS'] technical proposal, but [DEVIS] reduced its price proposal by [deleted]"). ISC, Aquilent, and Symplicity, however, did not make any changes their technical/price proposals. *See* AR 1180.

### J. The General Services Administration's Post-Protest "Best Value" Determination.

After re-evaluating the revised proposals, the Government concluded that Symplicity still provided the overall best value to the Government. *See* AR 1170. Like the initial "Best Value Determination," three documents provided the Government's rationale for this decision.

### 1. The December 2, 2005 Determination That The Offers From The Awardee and Plaintiff Were Technically Acceptable.

On December 2, 2005, "Determination that Proposals Received from Two Offerors be Considered Technically Acceptable," was issued. *See* AR 1189–97. This document was signed by the SSA and the CO concurred. *See* AR 1197; *but see* AR 1057 (June 3, 2005 Source Selection Advisory Council ("SSAC") Award Briefing: "Contracting Officer (CO) *provided* a Determination & Finding to the SSA that proposals from Symplicity and ISC are technically Acceptable[.] ... SSA *concurred* that the Symplicity and ISC proposals are technically Acceptable." (emphasis added)); AR 1197 (indicating that the CO issued his concurring signature on November 21, 2005, twelve days before the SSA's primary signature).

This document was copied *verbatim* from the May 26, 2005 Determination that Proposals Received from Two Offerors be Considered Technically Acceptable. *See* AR 1189–97; *compare id., with* AR 1037–45.

### 2. The December 5, 2005 Recommendation For Award.

On December 5, 2005, the CO issued "Recommendation for Award." *See* AR 1198–1208. The SSA concurred. *See* AR 1208. First, the CO briefly summarized the *pre-award* price and technical evaluations of the four competitive Proposals. *See* AR 1201–03.[20] The CO then summarized the post-award revised Price and Technical Proposals taking into account Amendment 0007. *See* AR 1203–06.[21] DEVIS, however, was the

---

19. Amendment 0007 established mandatory security requirements and guidelines for how to authenticate users. *See* AR 1143–50.

20. The CO stated, relying on the February 11, 2005 price evaluation, that "all of the offeror's proposed prices were considered *realistic,* fair and reasonable based on *that* offeror's proposed solution." AR 1201 (italics added, bold/italics in the original). The CO also restated the technical assessments. *See* AR 1202–03.

21. Since "there were no changes to any offeror's technical proposals," the technical evaluations were *not* re-analyzed and thus every technical assessments remained the same. *See* AR 1204 (stating that the slight change in the DEVIS Proposal would not affect the overall adjectival or confidence rating).

only offeror that submitted a revised Price Proposal in the intervening months. *See* AR 1204. The price analysis for Symplicity and ISC, however, did not change. *Id.*

After summarizing the procurement, the CO justified recommending award to Symplicity by referencing four documents and copying *verbatim* from the November 21, 2005 "CO's Summary of the Acquisition Process." See AR 1206–08; *compare id.* ("The 'Recommendation For Award Process' was a four-step process, which included three documents generated by the Contracting Officer for [the] Source Selection Authority (SSA) approval/concurrence, and one Source Selection Advisory Council SSAC [sic] recommendation briefing."), *with* AR 1186–88 ("The 'Recommendation For Award Process' was a four-step process, which included three documents generated by the Contracting Officer for [the] Source Selection Authority (SSA) approval/concurrence, and one Source Selection Advisory Council SSAC [sic] recommendation briefing.").

After referencing the documents that justified the award recommendation,[22] the CO concluded:

> The recommendation to award to Symplicity Corporation, whose offer still provides the best overall value to satisfy the government's need, is still valid. This decision is based upon careful review of the factors and subfactors identified within the Solicitation, and comparison of the strengths, weaknesses, and risks that were documented in the technical and price evaluation reports.

---

**22.** *See* AR 1206–07 ("The 'Recommendation For Award Process' was a four-step process, which included three documents generated by the Contracting Officer for [the] Source Selection Authority (SSA) approval/concurrence, and one Source Selection Advisory Council SSAC [sic] recommendation briefing[:]" 1) Determination that Proposals Received from Two Offerors be Considered Technically Acceptable; 2) Best Value Determination; 3) Recommendation for Award; and 4) June 3, 2005 SSAC Award Briefing).

**23.** Like the June 16, 2005 "Best Value Determination," this document was labeled as an attachment to the CO's Recommendation for Award. *See* AR 1092, 1209.

AR 1208; *compare id., with* AR 1188 ("The recommendation to award to Symplicity Corporation, whose offer still provides the best overall value to satisfy the government's need, is still valid.").

> **3. The December 5, 2005 "Best Value" Determination And December 7, 2005 Award To The Awardee.**

On December 5, 2005, a document entitled "Best Value Determination" was issued and signed by both the SSA and CO.[23] *See* AR 1209–25. First, the SSA and CO summarized the technical evaluation of the offerors, but did not mention of any documented weaknesses.[24] *See* AR 1210–15.

Next, the SSA analyzed the cost savings associated with early implementation, pursuant to Amendments 0004, 0005, and 0006:

> The ISC proposed accelerated delivery schedule establishes an FOC [25] date of [deleted] calendar days after contract award vice the Government delivery schedule of 180 days after Government Acceptance of IOC, or [deleted] calendar days after contract award. However, the Government envisions that the Government Acceptance Test and Evaluation, and Vendor and Agency Migration phases of either the ISC FBO system or another offeror's FBO system *will be identical.* For example, the Government might decide to use the Current FBO system release methods prior to transitioning to the FOC system. For this reason, the Government can not [sic] identify and quantify any significant cost savings associated with implementation of the ISC FOC system delivery vice another's [sic] offeror's FOC system.

---

**24.** For example, there was no mention of the potential staffing problems associated with Symplicity's Proposal, although that was an area of concern highlighted by both the Majority Report the and Minority Report. *See* supra Section E.

**25.** GSA defined Full Operational Capacity ("FOC") as satisfying all of the IOC requirements, *i.e.* with the new FBO system having the full functionality and capacity as required in the Solicitation, and incorporating the enhancements proposed and accepted by the Government. *See* AR 571.

* * *

Even if the Government were to consider ISC's assertion that the ISC FBO system was available on day [deleted] for use, such an assertion only adds [deleted] calendar days of time and would only increase the cost savings by [deleted] and bring the total cost savings to [deleted]. These carefully evaluated cost savings, *associated with early implementation,* were determined to not be dispositive, because of the significant price difference between the offeror's prices, and do not have significant impact on the award decision. Further discussion on this topic is not warranted as the cost savings difference does not change the best value analysis.

AR 1218 (emphasis and footnote added). The SSA and CO further concluded that the cost savings associated with early implementation of the DEVIS Proposal were "not dispositive" and did not "have a significant impact on the award decision." AR 1223.

In addition, the SSA and CO justified the decision to re-award the contract to Symplicity, as follows:

As part of the trade-off analysis, the strength of the [DEVIS] proposal, which included early implementation, hardware architecture, data archive strategy, software architecture, functionality, transition planning, management and key personnel were reviewed by the Program Office and found to be attractive, however, it was determined that there is no rationale for spending an additional [deleted] for the perceived technical strengths of the Devis proposal. A trade-off for the non-cost factors could not justify the price premium when we believe that Symplicity can provide an *acceptable technical solution* that fulfills the Government's requirements at a significantly lower price.

For [DEVIS], it is determined, through the Best Value trade-off analysis, that the savings of [deleted] for early transition leading to a total evaluated price of [deleted], and other perceived non-cost benefits of its higher priced proposal does offset the lower priced, technically *"Acceptable with Confidence"* offer from Symplicity.

AR 1224 (emphasis omitted and added).

Comparing Symplicity's bid with the ISC Proposal, the SSA provided that "ISC and Symplicity both received similar technical adjectival ratings of 'Acceptable' with Confidence, so according to the RFP, provision M.2, the price analysis took on more importance." AR 1224. Accordingly, the SSA concluded:

As part of the trade-off analysis, the strengths of the ISC proposal, [which] includes its experience as the incumbent subcontractor, a proposal for early implementation, strong interagency coordination, plans for maintaining existing and familiar interfaces, partnering with IMSI [,a software development company] for C & A [ ("Certification and Accreditation)" ] process, maximizing return on investment in the current FBO, understanding of the issues associated with the software development life cycle, approach to delivering software, management, and key personnel were reviewed by the Program Office and *found to be attractive, however* it was determined that there is no rationale for spending an additional [deleted] for the perceived technical strengths of the ISC proposal. A trade-off for the non-cost factors, including past experience, could not justify the price premium, when we believe that Symplicity can provide an *acceptable technical solution* that fulfills the Government's requirements at a significantly lower price.

For ISC, it is determined, through the Best Value trade-off analysis, that the savings of [deleted] for early transition leading to a total evaluated price of [deleted], and other perceived non-cost benefits of its higher priced proposal does offset the lower priced, technically *"Acceptable with Confidence"* offer from Symplicity.

AR 1224 (emphasis omitted and added).

On December 7, 2005, GSA reaffirmed the decision to award the FBO contract to Symplicity. *See* AR 1170, 1172, 1174.

## II. PROCEDURAL HISTORY.

On December 22, 2005, ISC filed a Complaint in the United States Court of Federal Claims, pursuant to 28 U.S.C. §§ 1491(b)(1). On the same day, the court convened a telephone conference to set a schedule. On December 23, 2005, the Court entered a Protective Order.

On December 29, 2005, DEVIS filed a Motion to Intervene, pursuant to RCFC 24(a). On December 29, 2005, the court granted DEVIS' motion. On January 9, 2006, the court convened a telephone conference after the Government filed the Administrative Record to set a schedule. On January 11, 2006, the court convened another status conference to discuss scheduling. On January 13, 2006, the court issued a scheduling order. On January 17, 2005, ISC filed an Amended Complaint. On January 24, 2006, the court convened another status conference. On January 24, 2006, the court issued an order regarding Plaintiff's discovery request.

On February 1, 2006, DEVIS filed a Motion for Judgment on the Administrative Record, together with a Memorandum in Support and a statement of facts. On February 1, 2006, ISC filed a Motion for a Permanent Injunction, that was converted into a Motion for Judgment on the Administrative Record on February 6, 2006. ISC also filed a Memorandum in Support of the February 1, 2006 Motion and a Statement of Facts on February 6, 2006. On February 17, 2005, the Government filed a Consolidated Opposition, together with a Memorandum in Support and a Statement of Facts.

On February 23, 2006, the Government filed a first supplemental Administrative Record, by leave of the court. On February 23, 2006, ISC filed a Reply to the February 17, 2005 Consolidated Opposition, together with a Counter–Statement of Facts. On February 24, 2006, DEVIS filed a Reply, together with a Counter–Statement of Facts.

On March 1, 2006, the court convened an oral argument. On March 15, 2006, the court set a scheduling order for post-hearing briefs. On April 4, 2006, the parties filed post-argument briefs. On April 6, 2006, the Government filed a second supplemental Administrative Record, by leave of the court.

## III. DISCUSSION.

### A. Jurisdiction.

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, §§ 12(a), (b), 110 Stat. 3870 (Jan. 3, 1996), authorizes the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1350 (Fed.Cir.2004) ("The [United States] Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. ¶ 1491(b), enacted as part of the Administrative Dispute Resolution Act of 1996[.]").

The Amended Complaint alleges that GSA violated numerous Federal Acquisition Regulations ("FAR") in awarding the contract to Symplicity. *See* Amend. Compl. ¶¶ 21, 22. These allegations recite a sufficient basis for the court to exercise jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1).

### B. Standing.

■ As a threshold matter, a protester must establish that it is an "interested party." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with "interested party," as defined by the Competition in Contracting Act, 31 U.S.C. § 3551.[26] *See Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed.

---

**26.** The term " 'interested party,' with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A).

Cir.2006); *see also Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). A two-part test is applied to determine whether a protester is an "interested party" *i.e.*, the protestor must show that it was an *actual or prospective bidder* and the protester must have a *direct economic interest* in the procurement. *See Rex Serv. Corp.*, 448 F.3d at 1307 ("[T]o come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.") (citations omitted).

■ In addition to establishing status as an "interested party," under 28 U.S.C. § 1491(b)(1), a protestor must also show that any alleged errors caused "prejudice." *See Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir.2004) ("[T]o prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it.") (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996) (alterations in original)); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed.Cir.2002) ("prejudice (or injury) is a necessary element of standing."). The United States Court of Appeals for the Federal Circuit has advised that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached *before* addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir. 2003) (emphasis added); *see also Myers*, 275 F.3d at 1369 ("standing is a threshold jurisdictional issue[.]" (citations omitted)).

■ The United States Court of Appeals for the Federal Circuit has held that a protestor can establish prejudice by showing a "substantial chance" that it would have received the award if the error was corrected. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed.Cir.2005) ("To establish prejudice Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for ... errors in the bid process."); *see also Statistica, Inc. v. Christopher*, 102 F.3d 1577 (Fed.Cir. 1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a *'substantial chance'* that [it] would receive an award-that is was within the zone of active consideration." (internal citations omitted) (emphasis and alterations in the original)). Panels of the United States Court of Appeals for the Federal Circuit, however, have taken different approaches regarding the evidence required to satisfy the "substantial chance" test in a bid protest case. *Compare Info. Tech. & Applications*, 316 F.3d at 1319 (a protestor must establish "that its chance of winning the award was 'greater than ... insubstantial.'"), *with Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir. 1999) ("holding that a protester is not required to show that, but for the alleged error, the protester would have been awarded the contract; instead a protester must show there was a 'substantial chance' it would have received the contract but for the alleged error"), *with Data Gen. Corp.*, 78 F.3d at 1562–63 (holding "the appropriate standard is that, to establish prejudice, a protestor must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract."). The United States Court of Appeals for the Federal Circuit, however, has cautioned against focusing too heavily on these semantic differences: "Rather than engage in verbal gymnastics, however, suffice it to say that *Data General* did not, *as it could not*, replace the 'substantial chance' standard with a more demanding one." *Statistica*, 102 F.3d at 1582 (emphasis added); *see also Myers*, 275 F.3d at 1370 ("[T]he substantial chance rule continues to apply[.]").[27]

---

27. Perhaps, the cause of "verbal gymnastics" surrounding the "substantial chance" test arises

because bid protests simply arise in many different procurement contexts. *See, e.g., Myers*, 275

Certainly, the question of prejudice turns, in part, on the relationship between the protestor(s) and the specific procurement process that is being challenged. Moreover, the United States Court of Appeals for the Federal Circuit has held that the issue of prejudice may be dependent upon the type of relief sought by the parties:

> In *Impresa [Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1333 (Fed.Cir.2001),] we considered the standard to be applied where the plaintiff claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process). [ ] To have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive.... [Plaintiff] *need not* show that it would have received the award in competition with other hypothetical bidders, [but rather] must show that it would have been a qualified bidder.

*Myers,* 275 F.3d at 1370 (emphasis added; citations omitted); *see also Alfa Laval,* 175 F.3d at 1367 ("[T]o establish competitive prejudice, protestor must demonstrate that but for the alleged error, 'there was a substantial chance that [it] would receive an award—*that it was within the zone of active consideration.'* ") (citing *Caci, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed. Cir.1983) (emphasis added)).

### 1. Plaintiff Has Standing.

#### a. As An "Interested Party."

■ ISC submitted a proposal in response to the Solicitation. *See* AR 2486–534. ISC's Proposal was determined to be within the competitive range. *See* AR 2539. All four offerors in the competitive range proceeded to the "best value" determination. *See* AR

1223–25. GSA's decision to award the contract to Symplicity directly affects the economic interests of ISC by depriving this company of a potential procurement. Accordingly, ISC is an "interested party." *See* 28 U.S.C. § 1491(b)(1); *see also Am. Fed'n Gov't. Employees,* 258 F.3d at 1302 ("We hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

#### b. Had A "Substantial Chance" of Being Awarded The Contract.

■ As previously discussed, the "substantial chance" test also depends, in part, on the procurement context. The FBO procurement was a "Best Value Determination" that combined both price and technical considerations. *See* AR 1209–25; *see also* AR 195. The determination, however, did not yield a numerical score, and, therefore, it is impossible to conclude which of the three unsuccessful offerors followed Symplicity in the "best value" hierarchy, *see* AR 1224 (concluding that the perceived benefits of the ISC and DEVIS Proposals do not offset Symplicity's lower price: "The perceived benefits of the other offerors do not outweigh the ... lower price of the Symplicity ... proposal, and the Government will not receive [deleted] ... and [deleted] ... in benefits from ISC Corporation and Devis Corporation respectively."), because the SSA did not distinguish between the ISC and DEVIS Proposals, since each Proposal was only compared against the Symplicity Proposal and not between each other.[28]

Since ISC has established that it is an "interested party" and had a "substantial chance" of being awarded the contract, the court has determined that ISC has standing.

---

F.3d 1366 (involving a sole-source procurement); *Info. Tech. & Applications,* 316 F.3d 1312 (involving a lowest priced, technically acceptable procurement); *United States v. Int'l Bus. Machines Corp.,* 892 F.2d 1006 (Fed.Cir.1990) (involving a sealed bid, lowest price procurement).

**28.** It is possible, however, to conclude that Aquilent was a distant fourth, since their proposal

incorporated both the lowest technical rating and the highest price of the four companies in the competitive range. *See* AR 1223 ("The Aquilent proposal received a technical adjectival rating of 'Marginal' with 'Little Confidence', and its price was the highest proposed at [deleted]. For these reasons the Aquilent proposal was eliminated from further consideration for award.").

*See Myers Investigative,* 275 F.3d at 1370 ("To have standing, the plaintiff *need only establish* that it 'could compete for the contract' if the bid process were competitive." (emphasis added) (internal citations omitted)).

### 2. The Intervenor Has Standing As A Matter Of Right, Pursuant To RCFC 24(a).

■ On December 29, 2005, the court granted DEVIS' December 29, 2005 Motion to Intervene as a Matter of Right, pursuant to Rule 24(a) of the United States Court of Federal Claims. In relevant part, Rule 24(a) provides:

Upon timely application anyone shall be permitted to intervene in an action: ... when the applicant claims an *interest relating to the property or transaction which is the subject of the action* and the applicant is so situated that the *disposition of the action may* as a practical matter *impair or impede the applicant's ability to protect that interest,* unless the applicant's interest is adequately represented by existing parties.

RCFC 24(a) (emphasis added); *see also Am. Mar. Transp., Inc. v. United States,* 870 F.2d 1559, 1561 (Fed.Cir.1989) ("Intervention is proper only to protect those interests which are of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment." (internal quotations & citations omitted)). The United States Court of Appeals for the Federal Circuit has held that "the requirements for intervention are to be construed in favor of intervention." *Am. Mar. Transp.,* 870 F.2d at 1561 (citing *Westlands Water Dist. v. United States,* 700 F.2d 561, 563 (9th Cir.1983)).

#### a. The Intervenor's Motion Was Timely.

The United States Court of Appeals for the Federal Circuit requires the trial court to evaluate three factors in determining whether an intervention is timely: "(1) the length of time during which the would-be intervenor[s] actually knew or reasonably should have known of [their] right[s;] (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[s] by denying intervention[;] (3) existence of unusual circumstances militating either for or against a determination that the application is timely." *Belton Indus., Inc. v. United States,* 6 F.3d 756, 762 (Fed.Cir.1993) (citations omitted & certain alterations in original). In this case, DEVIS filed a Motion to Intervene seven days after ISC filed the Complaint. Neither party opposed DEVIS' motion and the court is unaware of any prejudice to existing parties or any unusual circumstances militating against intervention. Therefore, the court determined that DEVIS' Motion to Intervene was timely.

#### b. The Intervenor Has An Interest Relating To The Property Or Transaction At Issue.

DEVIS also has "an interest relating to property or transaction which is the subject of [this] action," because DEVIS bid on the FBO contract and was determined to be in the competitive range. *See* AR 1176. Therefore, final judgment in favor of the Government will "impair" DEVIS' "ability to protect that interest." RCFC 24(a).

#### c. The Intervenor's Interest Was Not Adequately Represented By The Parties.

The Government will not adequately represent DEVIS' interest. The Government's objective is upholding the award of the FBO contract to Symplicity. Likewise, ISC will not adequately represent DEVIS' interest, since ISC's objective is to be awarded the FBO contract. Accordingly, DEVIS has satisfied the third element of RCFC 24(a).

### C. The Relevant Standards For Decision On The Administrative Record In A Bid Protest Case.

Pursuant to the Tucker Act, as amended by the ADRA, the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the

courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A). ("The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

█ The United States Court of Appeals for the Federal Circuit has held that "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Galen Med. Assocs.*, 369 F.3d at 1329 (citations omitted); *see also Bannum*, 404 F.3d at 1351 (holding that trial courts initially must determine if the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."); *Banknote Corp.*, 365 F.3d at 1350–51 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citation omitted)).

A "disappointed bidder" bears a "heavy burden" of showing that an award decision had no rational basis. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed.Cir.2001). This burden is even greater when the procurement is a "best value" procurement, as is the case here. *See Galen Med. Assocs.*, 369 F.3d at 1330 ("As the contract was to be awarded based on 'best value', the contracting officer had even greater discretion ... the relative merit of competing proposals is primarily a matter of administrative discretion." (citations omitted)); *see also Unisys Corp. v. Widnall*, 98 F.3d 1325, 1327 (Fed. Cir.1996) ("In determining whether the agency has complied with the regulation authorizing best value procurement the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

Therefore, when the court finds a "reasonable basis" for an agency's action, the court should "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (citation omitted); *see also U.S. v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed.Cir. 1983) (holding that the court may interfere with a federal Government procurement process "only in extremely limited circumstances"). This standard recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency is the result of a process that "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see also Impresa*, 238 F.3d at 1333–34 ("[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." (citation & internal quotations omitted)).

If a trial court finds that an agency's decision making fails an APA review, the court must then inquire whether the bidder was prejudiced by the Government's conduct. *See Bannum*, 404 F.3d at 1351; *see also Impresa*, 238 F.3d at 1333 ("When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" (citations omitted)). A claim on the merits of a bid protest will only succeed if both requirements are satisfied. *Bannum*, 404 F.3d at 1351; *see also Galen Med. Assocs.*, 369 F.3d at 1330 ("'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.*, 78 F.3d at 1562) (alterations in original)). Prejudice, in this context, requires the protestor to show a "substantial chance" that it would have received the contract award, but for the APA error. *See Bannum*, 404 F.3d at 1358 ("To establish prejudice, Bannum was required to show that there was a 'substantial chance' it

would have received the contract award but for the ... errors in the bid process."); *see also Metcalf Constr. Co., Inc. v. United States*, 53 Fed.Cl. 617, 622 (2002) ("[M]inor errors or irregularities, *i.e., harmless errors,* committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision." (emphasis added)).

Not every violation of the APA demands an equitable remedy: "We thus hold that, in a bid protest action, section 1491(b)(4) does *not* automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award." *PGBA, LLC. v. United States*, 389 F.3d 1219, 1226 (Fed.Cir.2004) (emphasis added). In *PGBA*, the United States Court of Appeals for the Federal Circuit has affirmed a ruling by the United States Court of Federal Claims where a protestor's claim for injunctive relief was denied in "public interest grounds", even though the plaintiff established prejudicial error in the procurement process. *Id.* at 1223 ("TMA made several prejudicial errors in its evaluations of the technical merits of PGBA's and WPS's proposals ... however, the [United States Court of Federal Claims] concluded that the balance of hardships and the public interest favored allowing TMA and WPS to proceed with the contract."). The United States Court of Appeals for the Federal Circuit reasoned, "there is no evidence that Congress intended to abolish the tradition of equitable discretion in issuing injunctive relief when it enacted section 1491(b)(4) in ADRA." *Id.* at 1227; *see also id.* ("This construction is consistent with the language of 28 U.S.C. § 1491(b)(2), which, through use of the permissive 'may,' provides the United States Court of Federal Claims with discretion in fashioning relief."). Accordingly, procurement error does not necessarily require the trial court to order equitable relief, but instead to decide whether to issue the injunction. *Id.* at 1228 (listing the traditional four factors that the trial court should use in determining whether to issue a permanent injunction).

The standard of review for a Motion for Judgment on the Administrative Record, pursuant to RCFC 52. 1,[29] is similar but not

---

**29.** On June 20, 2006, the Clerk of the United States Court of Federal Claims issued changes to the Rules of the United States Court of Federal Claims. In part, the amended rules supplant RCFC 56.1 with a new RCFC 52.1. The new RCFC 52.1(a) makes provisions for the filing of the administrative record in certain cases. *See* RCFC 52.1(a) ("In all cases in which action by, and a record of proceedings before, an agency is relevant to a decision, the administrative record of such proceedings shall be certified by the agency or agencies and filed with the court. The court may by order, including a scheduling order entered pursuant to RCFC 16(b) and Appendix A or C, establish a time for filing the administrative record."). RCFC 52.1(b) permits any party to "move for partial or other judgment on the administrative record" and sets forth the relevant procedures. *See* RCFC 52.1(b) ("The parties may move for partial or other judgment on the administrative record filed with the court. Absent an order by the court setting a different procedure, in any such motion or supporting memorandum, the moving or cross-moving party shall include a Statement of Facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the court. The opposing party shall include in any response a Counter–Statement of Facts that similarly draws upon and cites to the administrative record."). The Rules Committee explained the reason for this change:

> RCFC 52.1 has no [Federal Rules of Civil Procedure] counterpart. The rule replaces an

earlier rule, RCFC 56.1, that applied certain standards borrowed from the procedure for summary judgment to review of an agency decision on the basis of an administrative record. That incorporation proved to be confusing in practice because only a portion of the summary judgment standards were borrowed.... Specifically, the now repealed Rule 56.1 did *not* adopt the overall standard that summary judgment might be appropriate where there were no genuine issues of material fact. *See* RCFC 56(c). Nonetheless, despite this omission, parties, in moving for judgment on the administrative record under the prior rule, frequently would contest whether the administrative record showed the existence of a genuine dispute of material fact. To avoid this confusion, the new rule omits any reference to summary judgment or to the standards applicable to summary judgment.

RCFC 52. 1, Rules Comm. Note (June 20, 2006).

Plaintiff's and Intervenor's Motions for Judgment on the Administrative Record were filed, pursuant to the predecessor to RCFC 56.1. RCFC 86, however, provides that an amendment to the Rules of the United States Court of Federal Claims "are applicable to all proceedings pending at the time of adoption or thereafter filed, except to the extent that in the opinion of the court their application in a particular action pending when the revisions or amendments take effect would not be feasible or would work injustice, in which event the former procedure ap-

identical to a Motion for Summary Judgment, pursuant to RCFC 56. *See Bannum,* 404 F.3d at 1355. The inquiry on a Motion for Summary Judgment is whether the moving party has proven its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* RCFC 56. In contrast, the standard for a decision on a Motion for Judgment on the Administrative Record is more limited, *i.e.,* given all the disputed and undisputed facts, whether the plaintiff has met the burden of proof to show that the decision was not in accordance with the law. *See Bannum,* 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record."); *see also* RCFC 52.1.

### D. The Court's Resolution Of The Parties' Motions For Judgment On The Administrative Record.

Plaintiff and intervenor collectively made a comprehensive challenge of numerous alleged deficiencies regarding this procurement. To facilitate review of this Memorandum Opinion, the decisions of GSA that the court has determined met the APA standard of review are addressed first. Then, the court analyzes decisions of the agency that do not satisfy this standard.

#### 1. Unspecified Actions Of The Office Of Federal Procurement Policy That Were Alleged In Paragraph 23 Of The Amended Complaint Are Dismissed.

The Amended Complaint alleges that "officials at the Office of Federal Procurement Policy [ ("OFPP") ] interfered in the process and evaluations to the detriment of ISC." Am. Compl. ¶ 23. According to ISC, the alleged interference "exceed[ed] the expressly limited authority of OFPP." *Id.* (citing 41 U.S.C. § 405(c)). ISC, however, has not provided the court with any further information to substantiate this allegation. Nor was it

plies." RCFC 86. Because the parties had completed briefing prior to the June 20, 2006

discussed by any of the parties during the Oral Argument or in any of the pleadings submitted after the Amended Complaint was filed. In any event, the court's independent review of the Administrative Record does not reveal any improper interference by OFPP with this procurement. Accordingly, the court has determined that the Administrative Record does not support the allegation contained in paragraph 23 of the Amended Complaint.

#### 2. The General Services Administration Had Authority To Award The Contract.

DEVIS alleges that GSA did not have authority to award the Contract to Symplicity. *See* Int. Mot. at 27 ("As with the decision to raise Symplicity's ratings, the decision to award the contract to Symplicity was made without authority.... [T]he record reflects the fact that the award decision was apparently not made by the SSA but by the CO, who did not have authority to make the award decision."). The SSEP delegated authority to award the Contract to the SSA. *See* AR 35 (stating that it was the responsibility of the SSA to select the contract awardee). If the decision to award the Contract to Symplicity was made by some entity other than the SSA, DEVIS would be correct in arguing that the award decision was made without authority.

The court's review of the Administrative Record, however, does not evidence that the CO, instead of the SSA, made the final award decision. In arguing to the contrary, DEVIS relies heavily on the CO's June 3, 2005 Award Briefing: "Contracting Officer (CO) provided a Determination & Finding to the SSA that proposals from Symplicity and ISC are technically Acceptable[.] ... SSA concurred that the Symplicity and ISC proposals are technically Acceptable." AR 1057; *see also* Int. Mot. at 24 ("The CO's briefing of the ACE, dated June 3, 2005, makes clear that the decision to increase the rating of Symplicity proposal from 'Unacceptable' to 'Acceptable' was actually made by the CO himself."). This statement alone, however,

amendments, RCFC 52.1(b) is not applicable in this case.

does not evidence that the award decision was made without authority, since all of the decision documents include the SSA's signature. *See* AR 1197, 1208, 1225. The court reads the CO's statement to indicate only that the SSA agreed with the CO's recommendation, as the SSEP contemplated:

Contracting officer [will]:

*Prepare the Source Selection Decision Document* (final and any interims), Source Selection Decision Debriefing, *and other documents for further review and approval by the SSA.*

AR 35 (emphasis added).

Although the SSA's role in the procurement process may have been minimal, the SSA's signature on the decision documents demonstrates that the SSA authorized the contract award to Symplicity. Therefore, the court has determined that the contract award to Symplicity was made with authority.

3. **The General Services Administration Did Not Violate Federal Acquisition Regulation 15.208(b)(1) (Late Offers).**

ISC also argues that GSA violated FAR 15.208(b)(1), that prohibits a procuring agency from considering late offers for a contract award, except in limited circumstances.[30] *See* Pl. Supp. Br. at 47. According to ISC, Symplicity's initial submission "was so materially deficient that it could not properly have been considered an offer[;]" and, therefore, "Symplicity's submission of a 'revised proposal' to GSA on September 20, 2004 was . . . Symplicity's first actual offer responding to the [S]olicitation." *Id.* Because the Solicitation required initial offers be submitted by 3:00 p.m. on June 24, 2004, FAR 15.208(b)(1) prevented GSA from considering Symplicity's September 20, 2004 submission.[31] *See* AR 299.

ISC complains that Symplicity's September 20, 2004 submission was not an "offer," as defined in the FAR. *See* Pl. Supp. Br. at 47 (citing 48 C.F.R. § 2.101). FAR 2.101 defines an "offer" as *"a response to a solicitation that, if accepted, would bind the offeror to perform* the resultant contract." 48 C.F.R. § 2.101 (emphasis added); *see also id.* ("Responses to invitations for bids (sealed bidding) are offers called 'bids' or 'sealed bids'; responses to requests for proposals (negotiation) are offers called 'proposals'; however, responses to requests for quotations (simplified acquisition) are 'quotations', not offers."). Although this definition contemplates that a response may "bind[ ] the offeror to perform[,]" the precise language does not imply that a response may not be considered an "offer," based on contents or subsequent modification, so long as that modification is determined to be favorable to the Government. *See* 48 C.F.R. § 15.208(b)(2). The text of FAR 2.101 does not appear sup-

---

30. FAR 15.208 provides, in relevant part:

(b) (1) Any proposal, modification, or revision, that is received at the designated Government office after the exact time specified for receipt of proposals is "late" and will not be considered unless it is received before award is made, the contracting officer determines that accepting the late proposal would not unduly delay the acquisition; and—

(i) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or

(ii) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of proposals and was under the Government's control prior to the time set for receipt of proposals; or

(iii) It was the only proposal received.

(2) However, a late modification of an otherwise successful proposal, that makes its terms more favorable to the Government, will be considered at any time it is received and may be accepted.

\* \* \*

(d) If an emergency or unanticipated event interrupts normal Government processes so that proposals cannot be received at the Government office designated for receipt of proposals by the exact time specified in the solicitation, and urgent Government requirements preclude amendment of the solicitation closing date, the time specified for receipt of proposals will be deemed to be extended to the same time of day specified in the solicitation on the first work day on which normal Government processes resume.

48 C.F.R. § 15.208.

31. Although FAR 15.205 has three exceptions, none are relevant in this case. *See* 48 C.F.R. §§ 15.208(b)(1)(i)-(iii).

port the distinction suggested by ISC. Moreover, Plaintiff has not cited, and the court independently has not been able to identify, any precedent to support Plaintiff's interpretation. Since the Government awarded the contract at issue to Simplicity, *ipso facto,* the Government determined the September 20, 2004 submission to be favorable.

Accordingly, the court has GSA did not violate FAR 15.208(b)(1).

### 4. The General Services Administration Did Not Violate Federal Acquisition Regulation 15.305(a) (Factors Specified In Solicitation).

ISC alleges that GSA violated FAR 15.305(a) by not conducting a "price realism analysis" of the offerors' Proposals. *See* Pl. Supp. Br. at 49 ("Section 15.305(a) of the FAR requires agencies to evaluate proposals based on the evaluation criteria specified in the solicitation. The FBO solicitation stated that offers would be evaluated for price realism. GSA did not perform a price realism analysis, and in failing to do so violated FAR 15.305(a)."); *see also* 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors *specified in the solicitation.*" (emphasis added)). According to ISC, the Government performed a "price reasonableness" analysis, but did not perform a "price realism" analysis. *See* Pl. Supp. Br. at 50 ("Price reasonableness and price realism are two different factors. A price *reasonableness* analysis ensures that the government does not pay too much for supplies or services. A price *realism* analysis ensures that a contract can actually be performed for the offered price and that an offeror understands the requirements of the solicitation." (emphasis in the original)).

FAR 15.404–1 identifies several analytical techniques, including: "price analysis," "cost analysis," and "cost realism analysis." 48 C.F.R. §§ 15.404–1(b), (c), (d), (e). "Price analysis" involves an examination and evaluation of "a proposed price without evaluating its separate cost elements and proposed profit." 48 C.F.R. § 15.404–1(b)(1).

A "cost analysis" requires "the review and evaluation of the separate cost elements and profit in an offeror's or contractor's proposal (including cost or pricing data or information other than cost or pricing data), and the application of judgment to determine how well the proposed costs represent what the coast of the contract should be, assuming reasonable economy and efficiency." 48 C.F.R. § 15.404–1(c)(1).

In contrast, a "cost realism analysis" entails an "independent[ ] review[ ] and evaluati[on][of] specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." 48 C.F.R. § 15.404–1(d)(1); *see* generally COST REALISM ANALYSIS: SOME CRITICAL MISTAKES, 20 No. 8 NASH & CIBINIC REP. ¶ 36 (2006) (explaining that the FAR contains a "convoluted definition" of "cost realism analysis" and identifying several reoccurring themes in the decisions regarding "cost realism analysis"). In addition, FAR 15.404–1(d)(3) explains that a "cost realism analysis" may be used on "competitive fix-price incentive contracts or, in exceptional cases, on other competitive fixprice-type contracts when new requirements may not be fully understood by competitive offerors, there are quality concerns, or past experience indicates that contractors proposed costs have resulted in quality or service shortfalls." 48 C.F.R. § 15.404–1(d)(3).

Leading government contracting scholars have observed that:

Although the FAR refers to this process as cost realism analysis, greater clarity is achieved by calling it "price realism analysis." This signifies that such analysis *cannot be used to adjust the offered prices* but may only be used to make a responsibility determination, a performance risk assessment, or an analysis of whether the offeror understands the work.

RALPH C. NASH, JR., JOHN CIBINIC, JR. & KAREN R. O'BRIEN, COMPETITIVE NEGOTIATION: THE SOURCE SELECTION PROCESS 589 (2d ed. 1999) ("COMPETITIVE NEGOTIATION"); *see*

*also* PRICE REALISM ANALYSIS: A TRICKY IS-SUE, 12 No. 7 NASH & CIBINIC REP. ¶ 40 (1998) ("According to the FAR, there is no such thing as price realism analysis. Yet many of us know that it is analysis to determine if the offeror's proposed prices are unrealistically low. FAR 15.401–1 recognizes this concept in its discussion of the use of cost realism analysis[.]"). This distinction is particularly relevant in the context of a procurement for a fixed-price, incentive contract, as is the case here. *See* AR 87, 134.

█ Although the FAR require that a procuring agency evaluate the *reasonableness* of an offeror's proposed price and, where cost data is required, the *reasonableness* of an offeror's proposed costs, the FAR does not mandate that either a "cost realism analysis" or "price realism analysis" be performed, unless the procurement is for a cost-reimbursement contract or the Solicitation so requires. *See* 48 C.F.R. §§ 15.404–1(a)(2), (3), (d)(2); *see also Int'l Outsourcing Servs., LLC v. United States,* 69 Fed.Cl. 40 n. 7 (2005) ("However, 'an agency at its discretion may ... provide for a price realism analysis in the solicitation of fixed-price contracts." (internal citations omitted; emphasis added)); 48 C.F.R. §§ 15.404–1(a)(1), (d)(3) ("The contracting officer is responsible for evaluating the reasonableness of the offered prices.... [P]roposals shall be evaluated *using the criteria in the solicitation*[.]" (emphasis added)).

In this case, Section M of the Solicitation advised that "[p]rice evaluation will focus *heavily* on the *realism of the proposed prices* for the scope and nature of the solution/services proposed." AR 257 (emphasis added). Section M also stated that:

A *price analysis* of each CLIN, including optional CLIN 0002 and optional 0003, *will be performed* on the proposed Firm–Fixed Price, including an analysis of the price detail for equipment, labor, hosting, etc., which supports the proposed Firm–Fixed Price. The price analysis *will be performed* in accordance with FAR 15.404–1(b)(2)(ii) through (vii) to allow the Government to determine that the proposed Firm–Fixed Price is *fair and reasonable.*

To ensure fair, reasonable, balanced, and *realistic* prices, the Government *will perform* a price analysis. All proposed prices *may be* subject to price *and/or* cost analysis.

AR 264 (emphasis added). Therefore, the Solicitation required a "price analysis" *and* a "price realism analysis, nothing more." *See* AR 264 ("The price analysis will be performed in accordance with FAR 15.404–1(b)(2)(ii) through (vii)"); AR 257 ("Price evaluation will focus heavily on the *realism* of the proposed prices for the scope and nature of the solution/services proposed." (emphasis added)).

ISC concedes that the Government performed an adequate "price analysis." *See* TR at 65 ("[W]e will concede that the price evaluation team did a wonderful job on price reasonableness[.]"); *see also* 48 C.F.R. § 15.404–1(b)(2) ("The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price. Examples ... include, but are not limited to, the following: ... (ii.) Comparison of previously proposed prices and previous Government and commercial contract prices with current proposed prices for the same or similar items."); *compare with,* AR 2403 ("The base price ... for the Web Hosting service component in the Symplicity proposal is slightly higher than the 'Fair and Reasonable' price *obtained from the Sprint FTS2001/Crossover Contract price for Web Hosting* [.] ... Therefore, it is concluded that the Symplicity price proposal for Web Hosting is fair and reasonable." (emphasis added and omitted)). The issue then is whether GSA properly evaluated the Proposals for a "price realism analysis" as required by the terms of the Solicitation.

█ When conducting a "price realism analysis," substantial discretion has been given to the contracting agency. *See Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99, 106 (2001) ("[T]he nature and extent of an agency's price realism analysis are matters within the agency's discretion."); *c.f. Andersen Consulting v. United States,* 959 F.2d 929, 935 (Fed.Cir.1992) ("[E]ven if Anderson was correct about every other one of its allegations of faulty price analysis[,] ...

[t]hese findings [nevertheless] are sufficient to support the price realism analysis performed by [the agency].") This discretion is even more pronounced when the Solicitation is silent regarding the methodology to be used in conducting a "price realism analysis," as is the case here. *See Matter of Burns & Roe Servs. Corp.,* B–296,355, 2005 CPD ¶ 150, 2005 WL 2037620 (GAO July 27, 2005) ("The nature and extent of an agency's price realism analysis ultimately are matters within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation."); *see also Matter of Puglia Eng'g of California, Inc.,* B–297,413, 2006 CPD ¶ 33, 2006 WL 346323 (GAO Jan. 20, 2006) ("The nature and extent of the agency's price analyses are matters within the sound exercise of the agency's discretion, and our review of such an evaluation is limited to determining whether it was reasonable and consistent with the provisions of the solicitation."). The discretion afforded to an agency regarding price analysis is consistent with the general principles underlying an APA review of agency decisions. *See Honeywell,* 870 F.2d at 648 ("If the court finds a reasonable basis for the agency's action, *the court should stay its hand* even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." (emphasis added; citations omitted)).

The Comptroller General also has offered useful guidance concerning the methods that an agency can utilize when engaging in a price realism analysis:

The record shows that the agency evaluated the realism of an offeror's price proposal by comparing prices against one another and the independent government estimate, *reviewing each offeror's cost proposal for compliance with the terms of the solicitation,* for mathematical accuracy, and comparing pricing data with the technical proposal.... In our view, the agency reasonably satisfied its obligation under the FAR and RFP to perform a price realism evaluation *and [the protestor's] mere disagreement with how the agency conducted its price realism analysis for these requirements and the*

*agency's ultimate conclusion that [the awardee's] prices were realistic does not establish that the agency's evaluation of the realism of proposed prices was unreasonable.*

*Matter of Burns & Roe Servs. Corp.,* B–296,355 2005 CPD ¶ 150, 2005 WL 2037620 (GAO July 27, 2005) (emphasis added); *see also* RALPH C. NASH, JR. & JOHN CIBINIC, JR., PRICE REALISM: IT'S DIFFERENT FROM PRICE REASONABLENESS, 17 No. 3 NASH & CIBINIC REP. ¶ 14 (2003) ("The balance of the FAR guidance in [48 C.F.R. § 15.404–1(d) ](3) contains most of the elements of sound guidance on price realism presented in a somewhat muddled fashion. However, we can paraphrase it more clearly by stating that a price realism analysis indicating that an offeror's price is very low can be used in three ways: (1) To assess an offeror's understanding of the work[;] (2) To assess the degree of performance risk posed by the low price[;] (3) To determine whether the offeror is a responsible contractor.").

 In this case, GSA the Price Team explained that, "Symplicity proposed a totally automated approach that offers the Government a *substantial reduction* of operating costs." AR 2402 (emphasis added). The GSA Price Team also explained that Symplicity utilized a "managed" model that accounted for the price savings associated with Symplicity's offer:

One significant benefit is that this model allows Symplicity to acquire system hardware without a significant initial onset of cost and [deleted] *provides the government with hosting services at a reduced cost primarily due to economies of scale.*

AR 2404 (emphasis added). By providing a cogent explanation as to why Symplicity's price was lower than the other offerors, the court is satisfied that GSA Price Team performed a "price realism analysis" in accordance with the Solicitation.

ISC argues that this type of analysis is insufficient, because the FAR explicitly provides for the methodology to be used in conducting a price realism analysis. *See* Pl. Mem. at 17 ("In order to determine whether an offered price on a fixed-price contract is

realistic, the FAR encourages the use of cost realism analysis.... As defined by the FAR, cost realism analysis is: '[T]he process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost estimates are realistic for the work to be performed[.]' "). ISC inappropriately exports the specifications in FAR 15.404–1(d)(1) for "costs realism analysis" to "price realism analysis." The factors listed by ISC are applicable only when the agency is engaging in a "cost realism analysis," pursuant to a cost-reimbursement contract. *See* 48 C.F.R. § 15.404–1(d). Here, the Solicitation, explicitly provided that the choice of using a "cost realism analysis" was discretionary. *See* AR 264 ("All proposed prices *may* be subject to price *and/or* cost analysis." (emphasis added)). Likewise, the FAR provide that a cost realism analysis is not required in a fixed-price incentive contract. *See* 48 C.F.R. § 15.404–1(d)(3) ("Cost realism analyses *may* also be used on competitive fixed-price-type contracts." (emphasis added)). Therefore, the court has determined that the GSA Price Team acted within its discretion by determining that Symplicity's price was realistic given Symplicity's unique Technical Proposal and economy-of-scale efficiencies.

Regarding FAR 15.305(a), ISC also argues that the Symplicity's low price should have been construed as unrealistic:

> The Price Evaluation Team failed to reconcile severe differences in the offerors' price proposals that signified that Symplicity lacked an understanding of the scope and nature of the contract. While Aquilent and Devis offered [deleted] and [deleted] respectively for the CLIN 0002 FedTeDS option, Symplicity offered [deleted].... Yet the Price Evaluation team does not explain how Symplicity could realistically perform these services for such a drastically lower price.

Pl. Supp. Br. at 50. The fact that an offeror submitted a low price does not diminish the agency's discretion in conducting a "price realism analysis:"

> Although [the protestors] question the quality of the [agency's] price analysis, the

protestors' allegations establish, at best, the agency's recognition that while [the awardee] may have submitted a below-cost offer, *this low price did not reflect a defective technical approach or lack of understanding on* [the awardee's] *part.* Indeed, the agency concluded that [the awardee's] low price resulted from *its particular pricing strategy, which included lower support costs, lower general and administrative costs, and lower profit.*

*Matter of Am–Pro Protective Agency, Inc.,* B–271,385, 96–2 CPD ¶ 192, 1996 WL 784528 (GAO Sept. 23, 1996) (emphasis added).

In this procurement, GSA concluded that Symplicity's lower price was a result of its "totally automated approach." AR 2402. Therefore, GSA considered the reasons for Symplicity's low price proposal. Although ISC disagrees with the outcome of the price analysis, that fact is not sufficient to warrant a finding of abuse of discretion. *See Int'l Outsourcing Servs.,* 69 Fed.Cl. at 48 ("[A]s this court has stated, 'the *nature and extent* of an agency's *price realism* analysis are matters within the agency's discretion.'" (emphasis added; citations omitted)). Therefore, the court has determined that GSA did not violate FAR 15.305(a) when conducting the required "price analyses," since it acted pursuant to the announced terms of the Solicitation.

5. **The General Services Administration's Technical Evaluations Had A Rational Basis.**

The Complaint alleges that GSA's technical evaluation of ISC's Proposal was unreasonable and was not rational. *See* Pl. Mem. at 30 ("In each and every instance, GSA did not have a rational basis for its conclusion, and in some instances, GSA assigned a technical deficiency or weakness to a pricing matter completely outside of the technical evaluation according to the terms of the solicitation."); *see also* Pl. Supp. Br. at 36 ("The Government's Technical Evaluation Of ISC's Proposal Was Unreasonable And Lacked A Rational Basis."). Here, ISC specifically challenges weaknesses identified by GSA at the ISC's post-award briefing. *See* AR 2362–75 (identifying seven independent

weaknesses). When analyzing whether an agency's decision is rational, the United States Court of Appeals for the Federal Circuit has held that: "[T]he test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, *and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis.'*" *Banknote*, 365 F.3d at 1351 (emphasis added; citations omitted); *see also Impresa*, 238 F.3d at 1332 ("When a challenge is brought on the [rational basis] ground, the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." (citations omitted)).

Moreover, when a trial court is analyzing an agency's technical evaluations, the United States Court of Appeals for the Federal Circuit *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996) has accorded the agency even greater deference:

> [The protestor's] twelve other substantive challenges to the procurement ... deal with the minutiae of the procurement process in such matters as *technical ratings* and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials *that a court will not second guess.*

*Id.* at 449 (emphasis added); *see also Advanced Data Concepts*, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is *highly deferential.*" (emphasis added)). Therefore, the United States Court of Federal Claims has been reluctant to micro manage the minutiae of a procurement to ferret out technical deficiencies: "It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals.... This court will not, therefore, second guess the technical ratings that the source selection committee gave to each offeror." *Omega World Travel, Inc. v. United States*, 54 Fed.Cl. 570, 578 (2002); *see also Acra, Inc. v. United States*, 44 Fed.Cl. 288, 293 ("[C]ontracting officers have broad discretion to determine which technical proposal best meets its needs."). Accordingly, ISC and DEVIS bear a heavy burden to persuade the court that GSA's

technical evaluations in this case were not rational.

### a. The General Services Administration's Decision To Increase The Technical Ratings Of ISC And Symplicity Had A Rational Basis.

 DEVIS challenges the increase in Symplicity and ISC's technical ratings arguing that the technical ratings were changed in order to fit a desired outcome and therefore, GSA's award of decision does not have a rational basis. *See* Int. Rep. at 21 ("Thus, the record demonstrates that the award decision was made first and justified later." (emphasis omitted)); *see also* Int. Mot. at 22 ("Such a reversal of standard decision-making practices must be considered *per se* arbitrary and capricious.").

When analyzing whether an agency's decision lacked a rational basis, the United States Court of Appeals for the Federal Circuit has advised trial courts that "the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, *and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis.'*" *Banknote*, 365 F.3d at 1351 (emphasis added; citations omitted); *see also Impresa*, 238 F.3d at 1332 ("When a challenge is brought on the [rational basis] ground, the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." (citations omitted)); *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed.Cir.2000) ("The *arbitrary and capricious* standard applicable here is *highly deferential.* This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."). The United States Supreme Court also has identified the factors that a reviewing court should scrutinize when determining whether an agency's decision lacks a rational basis: "Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also OTI Am., Inc. v. United States,* 68 Fed. Cl. 646, 653 (2005) (quoting same and applying this test to a bid-protest action).

The evidence put forth by DEVIS to establish GSA's *post hoc* decision-making consists primarily of a chronology of the procurement. *See* Int. Mot. at 21 ("This chronology—based on the CO's own time line of events and the documents provided by the government in this protest—strongly suggests that the award decision was based on a *post hoc* rationale to fit a predetermined outcome."). The court's independent review of the Administrative Record, however, does not reveal that the agency's decision-making process was made *post hoc,* even by a preponderance of the evidence standard. The chronology establishes that the CO made a final award recommendation to the SSA on May 17, 2005. *See* AR 1048. The CO's final award recommendation was provided to the SSA nine days earlier than the "Determination that Proposals Received from Two Offerors be Considered Technically Acceptable" was signed by the SSA and CO. *See* AR 1045 (indicating that the Determination was signed on May 26, 2005). Although DEVIS may be correct that GSA decided to award the Contract to Symplicity prior to deciding to raise the technical ratings of ISC and Symplicity, it is equally plausible that this document was prepared over a period of weeks. The Administrative Record does not establish that a draft version of the "Determination that Proposals Received from Two Offerors be Considered Technically Acceptable" existed at the time that the CO made the award recommendation to the SSA. Accordingly, DEVIS has not met its burden to establish that the "Determination that Proposals Received from Two Offerors be Considered Technically Acceptable" was a *post hoc* decision. *See State Farm,* 463 U.S. at 43, 103 S.Ct. 2856 ("Normally, an agency rule would be arbitrary and capricious if the agency ... offered an explanation for its decision that ... is so *implausible* that it could not be ascribed to a difference in view

or the product of agency expertise.") (emphasis added). Therefore, the court has determined that GSA's decision to raise the technical rating of ISC and Simplicity was not a *post hoc* decision and had a rational basis.

### b. The General Services Administration's Decision To Direct The Technical Evaluators To Consider Cost As A Technical Factor Had A Rational Basis.

 DEVIS also contests that GSA directed the Technical Evaluation Team to treat "Cost Containment" as priority. *See* Int. Mot. at 37 ("The apparent direction from the ACE to the Technical Evaluation Team to treat 'Cost Containment' as a '# 1' priority is a gross violation of the duties established by the RFP and the Source Selection Evaluation Plan *and may have substantially affected the technical rating results.*" (emphasis added)). Here, DEVIS is arguing that the technical evaluators improperly considered price in the procurement's technical evaluations. The Administrative Record, however, does not substantiate this charge. Despite proposing the second highest price out of the four offerors in the competitive range, DEVIS received a technical rating of "Excellent," that was the highest rating given to any offeror in the procurement. *See* AR 1198–1208. Therefore, even though Symplicity's Proposal was [deleted] less than the DEVIS Proposal, a majority of the technical evaluators decided, that the Symplicity Technical Proposal was "Unacceptable." *Id.* Therefore, DEVIS' argument that an ACE directive "substantially affected the technical rating results" is unfounded, since there is no indication in the Administrative Record that the technical evaluation team *considered* price and cost containment as a technical factor.

### c. The General Services Administration's Decision That Plaintiff's Elimination Of The Post–IOC Migration Period Was A Technical Weakness Had A Rational Basis.

 ISC first challenges GSA's decision that ISC's elimination of the post-IOC cus-

tomer migration period would adversely affect the transition from the old FBO system to their proposed new system. *See* Pl. Mem. at 30–31 ("GSA cited as a Technical Approach 'weakness' the alleged elimination by ISC of a 'customer migration period.... GSA cannot reasonably declare as a weakness in ISC's technical approach the failure to propose a detailed migration plan at the IOC stage.").

The Solicitation provided that offerors needed to "demonstrate accomplishment of a seamless transition from the current FBO system to [the] offeror's proposed system." AR 259; *see also* AR 199 (stating that offerors must "provide for and accomplish a seamless system transition from the current FBO system to the offeror's proposed FBO system"). Therefore, the Majority Report explained:

> "ISC assumes that the current FBO C & A [ ("certification and accreditation") ] could be amended without major modification within a much shorter period of time than would be required for an FBO replacement system and without loss of authority to operate FBO." During discussions, ISC reiterated that C & A was routine; only a minor upgrade to the C & A documentation would be necessary. ISC insisted that a new C & A will not be required and that it will have up to one (1) year to complete any new C & A documentation following changes to the system.... At this time, the government stated that *any upgrade* (in this case, application rehosting on new hardware/operating system) to the current FBO *will require a new C & A to be prepared* [.] ... *ISC will be required to submit a new C & A package. ISC persists in their assertions despite prior discussions to the contrary* .... ISC's position appears to be at odds with the guidance provided by the GSA's CIO office. It is not clear that ISC has accepted that the position of incumbent does not confer an ability to bypass the C & A processes.

AR 782–83 (emphasis added; bold and underlining in the original; footnotes omitted) (citing ISC's technical proposal).

Based on the Majority Report, GSA concluded that ISC's Proposal did not provide a "seamless transition," since assurances that a new C & A package would be forthcoming were not sufficient. Indeed, without specifications for a new C & A package, GSA rationally could have concluded that the ISC Proposal entailed a risk of delay, since time would have to spent procuring and implementing an updated C & A package. ISC's Supplemental Brief, quotes the Minority Report as support for ISC's contention that the Majority Report lacked a rational basis:

> ISC is intimately familiar with the C & A documentation and the government approval process used to obtain an ATO. ISC plans to leverage the existing C & A documentation and deliver it quickly to the GSA designated approving authority.
>
> ISC states: 'In the event that the GSA CIAO requires FBO recertification and reaccreditation, the current FBO C & A package provides ISC with a sound foundation of current baseline documentation that is readily updatable to facilitate and accelerate the recertification and reaccreditation process.' The majority weakness has no merit.

Pl. Supp. Br. at 37–38 (emphasis omitted) (citing the Minority Report).

The threshold issue for the court is to identify the documents that comprise the Government's technical evaluation. ISC argues that only the findings of the Minority Report should be considered when reviewing the Government's technical evaluations. *See* Pl. Supp. Br. at 37 ("It is instructive to review each of those alleged significant weaknesses as described by the Minority Technical Evaluation Team Report-the report apparently relied upon by the SSA."). The court disagrees, because ISC's argument takes issue with GSA's overall technical evaluation. *Id.* at 36 ("The Government's *Technical Evaluation* of ISC's proposal was unreasonable and lacked a rational basis."). The Majority Report, the Minority Report, and the Mitretek Report are all part of GSA's technical evaluation. Therefore, the court's review requires analysis of the findings of all three reports.

Having conducted this review and analysis, in the court's judgment, the Minority Report

establishes that there was a reasonable disagreement among the technical evaluators as to whether the ISC Proposal provided a seamless transition. Therefore, in this instance, the court will not second guess the finding that the ISC's Proposal's elimination of the post-IOC migration period was a weakness. *See Bliss,* 77 F.3d at 449 (cautioning that a trial court should not enter the "minutiae" of the procurement process); *see also Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1046 (Fed.Cir.1994) ("In reviewing procurement decisions, a [reviewing body] *may not second guess an agency's procurement decision and/or substitute its own judgment for that of the government.*" (emphasis added; citations omitted)).

### d. The General Services Administration's Decision That Plaintiff's Failure To Schedule "Train–The–Trainer" Classes Was A Technical Weakness Had A Rational Basis.

▆▆ ISC also takes issue with the GSA's decision that ISC's Proposal did not adequately schedule and incorporate "train-the-trainer" classes. *See* Pl. Mem. at 34. ("GSA cited as a Technical Approach 'weakness' the failure by ISC to schedule 'train-the-trainer' classes[.]"). as the Majority Report explained:

> The proposed train-the-trainer approach places the burden on the [G]overnment to train users and administer the FBO application at a time when government resources are limited. *The PWS/WBS does not specifically identify the train-the-trainer training.* ISC's approach to train-the-trainer (train the FBO administrators and they will then train their Departments/Agencies) *is not an acceptable performance-based technical solution.* The effort ISC refers to in 2001 cost the federal government an excessive amount of money to train its own personnel.

AR 781 (emphasis added).

ISC, also relies on the Minority Report's view that the identified weakness "has minimal merit." Pl. Supp. Br. at 42. The Minority Report states "No training required for IOC is consistent with ISC's approach that builds onto the current system.... [And,] ISC has an in-depth training approach

planned, to include 'train-the-trainer' successfully used in 2001." *Id.* GSA, however, concluded that, based on the findings of the Majority Report, ISC's proposed training program was a weakness, since only FBO administrators would be trained.

Although there was a reasonable disagreement between the Minority and Majority Reports regarding whether ISC's Proposal should have scheduled training classes, the court declines to second guess GSA's decision, particularly since a comparable effort in 2001 cost the Government an "excessive" amount of money. *See Bliss,* 77 F.3d at 449 (cautioning that courts should not enter the "minutiae" of the procurement process).

### e. The General Services Administration's Decision That Plaintiff's Failure To Include Enhancements In CLIN 0001 Was A Technical Weakness And A Management Approach Weakness Had A Rational Basis.

▆▆ ISC challenges GSA's conclusion that ISC's failure to include enhancements was a Technical Approach weakness. *See* Pl. Mem. at 32 ("GSA cited as a Technical Approach 'deficiency' the alleged failure by ISC to include enhancements in its base proposal price.... GSA's evaluation is unreasonable[.]"). ISC also challenges GSA's conclusion that ISC's failure to include enhancements was a Management Approach weakness. *See* Pl. Supp. Br. at 43 ("The government once again cites as significant weakness the fact that ISC proposed to offer enhancements under a fixed price option.").

As the Majority Report stated:
> ISC's proposed solution is dependent on the current FBO. Its proposal for the new FBO suggests that there will be significant carry-over from the old application to the new, *and that innovation in the new FBO will be limited. The RFP identifies support for the development of future enhancements as one of the services sought by the government in a Firm Fixed Price contract.* In order for the Government to get the base set of services it desires, it would have to accept CLIN 0001 *and* exercise one of the levels of the Evolution options to obtain enhancement support.

Ongoing support for enhancements was included in the initial proposal CLIN 0001. However, it has been removed and two 'evolution' support options (with different levels of support) are offered.... *Unless the Government exercised one of these options, there will be NO enhancements after FOC except that might be required by a FAR change.*

AR 780 (emphasis added).

Therefore, the Majority Report concluded that ISC's incorporation of enhancements into options was a technical approach weakness, because the innovation in ISC's proposed FBO system would be limited, unless GSA decided to exercise the options. *Id.* The Majority Report further explained that the absence of enhancements within the baseline contract was a management approach weakness: "The proposed software development lifecycle appears to be a reformulation of the classic waterfall method, which has been in use for over 25 years. This model has known deficiencies and is not well adapted to web development projects." AR 795. ISC, quoting the Minority Report, argued that this approach was unreasonable since the Majority Report should have considered the optional enhancement supports as sufficient. *See* Pl. Supp. Br. at 40.

Again, the court has determined that GSA did not abuse its discretion in concluding that ISC's failure to place the enhancements in a CLIN was a weakness, since the Solicitation provided that offeror's were expected to enhance the existing FBO website. *See* AR 198 ("The offeror shall analyze, plan, design, document, build, develop, integrate, test, deploy, host, operate, validate, *enhance*, support, manage, and maintain a robust single-Government-wide Point of Entry System[.]" (emphasis added)). In the court's judgment, it was not unreasonable for the Government to conclude that ISC's failure to incorporate enhancements into the baseline proposal was a weakness, since the Solicitation contemplated such enhancements.

### 6. The General Services Administration Did Not Misrepresent Mitretek Inc.'s Technical Assessment Of Plaintiff's Proposal.

DEVIS argues that the CO misrepresented the Mitretek Report's technical assessment of the ISC Proposal. *See* Int. Mot. at 31 ("In making his award recommendation, the Contracting Officer flatly misstated the conclusions of the Technical Advisor, Mitre-Tek, in an important presentation of the overall results of the technical evaluations."). Mitretek's final technical evaluation of ISC concluded that: "From a *technical perspective*, this proposal can be categorized as being in the lower range of *Acceptable*. From the overall FBO perspective, this proposal should be considered Unacceptable." AR 689 (emphasis added). The CO, however, reported that Mitretek gave ISC a rating of "Acceptable." *See* AR 1054.

Although Mitretek's conclusion is not a model of clarity, the court does not agree that the CO misstated Mitretek's evaluation. It was rational for the CO to read Mitretek's analysis as indicating that the ISC Proposal was "Acceptable." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856 ("Normally, an agency rule would be arbitrary and capricious if the agency ... offered an explanation for its decision that runs counter to the evidence before the agency[.]"); *see also OTI*, 68 Fed.Cl. at 653 (quoting same and applying the APA test to a bid-protest action). In addition, the CO's statement does not "run counter to the evidence before the agency," since the Mitretek Report fairly can be read to indicate that ISC's Technical Proposal was "Acceptable." *See* AR 689 ("From a *technical perspective*, this proposal can be categorized as being in the lower range of *Acceptable*." (emphasis added)). Therefore, the court has determined that the CO did not misrepresent Mitretek's technical assessment of the ISC Proposal.

### 7. The General Services Administration's Price Evaluations That Had A Rational Basis.

### a. The General Services Administration's Evaluation Of Plaintiff's Price Proposal Had A Rational Basis.

 ISC argues that the Government unreasonably evaluated ISC's Price Proposal,

| Offeror | | |
| --- | --- | --- |
| DEVIS | [deleted] | Oracle software |
| ISC | [deleted] | MyFBO and Evolution Support A |
| Symplicity | $17,483,136.00 | Akamai, Oracle & additional labor for continuity of service for system transition |

since the Government included non-mandatory options in determining ISC's final proposed price. *See* Pl. Mem. at 38 ("GSA unreasonably evaluated ISC's price proposal by including a *non-mandatory option offered by ISC*."). The Solicitation, however, provided:

> A price analysis of each CLIN, *including optional CLIN 0002 and optional CLIN 0002*, will be performed on the proposed Firm–Fixed Price[.] ... The price analysis *will be based on the entire project, including all CLIN's.*

AR 264 (emphasis added). Accordingly, the Solicitation specified that option years would be included within the price analysis. Therefore, GSA did not abuse its discretion by considering ISC's proposed options. *See Impresa*, 238 F.3d at 1332 ("[C]ontracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process.").

In the alternative, ISC asserts that the Government's evaluation of ISC's Price Proposal was unreasonable, because Symplicity's Price Proposal did not include comparable enhancements and services. *See* Pl. Mem. at 38 ("The only way that GSA's cost/technical tradeoff in this instance would be reasonable would be if the awardee included in its price of [deleted] all of the services and enhancements proposed by ISC as part of its base proposal, MyFBO option, and its FBO Evolution Support–A offered by ISC[.]"). As previously discussed, ISC's enhancements were within option years, requiring GSA to exercise those options in order to receive full performance from ISC. Therefore, it was rational for GSA to include ISC's options in an analysis of ISC's price proposal, since GSA would have had to exercise those options in the future. Moreover, the SSA stated that the price for *all* four offerors in the competitive range was adjusted to ensure that the evaluated price included all capabilities and options that were necessary to meet the Solicitation's minimum requirements:

| Offeror | Adjusted Price | Options and Enhancements |
| --- | --- | --- |
| Aquilent | [deleted] | Performance Testing, Customer Survey, Two Site Hosting and all outyear support for EPR and FedTeDS |

AR 1201.

Since the SSA modified the Price Proposals of *every* offeror, ISC's argument that it was singled out for unfair treatment, is not supported by the Administrative Record. *See Impresa*, 238 F.3d at 1332 ("Contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process.").

### b. The General Services Administration's Evaluation Of Intervenor's Price Proposal Had A Rational Basis.

DEVIS argues that GSA improperly evaluated DEVIS' Price Proposal by including the estimated cost of Oracle software in the final cost estimate. *See* Int. Rep. at 20 ("[T]he agency improperly evaluated the estimated price of Oracle software—which was provided as an alternative for informational purposes—as part of an imaginary 'option' in the Devis proposal."). The Administrative Record evidences that DEVIS' price was considered by the SSA to be [deleted] when the SSA conducted the "best value" determination. *See* AR 1204. This included Oracle software priced at around [deleted]. *Id.* DEVIS contends that this Oracle software was not part of the offer. *See* Int. Rep. at 21 ("One does not need to attend law school to understand that there must be an 'offer' before 'acceptance' can occur. DEVIS Proposal relied on open-source software and *expressly disowned any intent to offer Oracle software*." (emphasis added)). The DEVIS Price Proposal, however, states otherwise:

> [DEVIS] is not offering any optional features at additional cost to the Government. Our quoted price reflects our recommended configuration for meeting the objectives of the project. The following alternatives were only provided should the Government have a particular preference and not as additional functionality that would increase our delivered value in a

trade-off comparison. As such, we have not included them as priced options in the Final Price Schedule. *[DEVIS] is ready to negotiate additional preferences or configurations (i.e., less complex infrastructure configurations should the Government's risk profile not require geographically dispersed sites, etc.) to better tailor our solution to your needs.*

[DEVIS] has made what we feel are the optimal technical decisions regarding software tools and have taken into consideration our impressions of where technology is moving as well as the directions for the IAE overall. *That said, in our proposal we have also priced two alternatives, one related to the SQL database and one to the J2EE server requirements.*

Our Technical Solution uses [deleted] as a database server in place of ORACLE. This innovative use of low cost Open Source Software (OSS) for the database component results in a savings of [deleted] (just for CLIN 0001A alone) as compared to a similar Technical Solution that uses ORACLE. If CLINs 0001B through 0001F are exercised, the cost of ORACLE would total approximately [deleted] dollars. *However, we understand there are external factors that the Government has to consider when selecting technology so we have provided choices. We have included the cost of using ORACLE as an alternative and have projected out the associated costs for CLIN 0001.*

AR 1524 (emphasis added).

Based on DEVIS' Price Proposal, GSA had a rational basis to presume that Oracle software was offered by DEVIS as a proposed alternative. *Id.* ("[W]e understand there are external factors that the Government has to consider when selecting technology *so we have provided choices.* We have included the cost of using ORACLE *as an alternative* and have projected out the associated costs for CLIN 0001." (emphasis added)). The words "as an alternative" indicate that DEVIS offered GSA the opportunity to purchase that package, if GSA desired. The Government is also correct in observing that: "GSA selected the alternatives it desired and compared the offerors' price accordingly. GSA

as the purchaser obviously has the discretion to do this: Devis cannot dictate the Government's needs." Gov't. Opp. at 28. Therefore, the court has determined that GSA properly exercised discretion in deciding that GSA was not required to accept DEVIS' offer of alternative software, if DEVIS was awarded the contract. The court declines to substitute its judgment for that of the agency. *See Impresa*, 238 F.3d at 1332 ("the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process.").

8. **The General Services Administration Made Other Decisions That Had A Rational Basis.**

 a. **The General Services Administration's Decision That Plaintiff's Failure To Provide Adequate Outreach Programs Was A Management Approach Weakness Had A Rational Basis.**

ISC contests that GSA's decision that ISC's Proposal did not contain adequate outreach mechanisms and help desk operations did not have a rational basis. *See* Pl. Mem. at 37 ("GSA cited as a Management Approach weakness the following: '[o]utreach mechanisms and training methods during Q & M removed from final proposal.' [ ] In reality, ISC specifically addressed outreach mechanisms in its proposal." (internal citations omitted)). The ISC Proposal provided that the, "already in-place SAIC staff will continue to provide support for help desk operations[.]" AR 1633. The Majority Report however, explained that:

Lack of outreach and training could cause [the] government great risk for internal business processes and program management issues among the different agencies. *There is no projected increase in Help Desk level of effort to support FedTeDS functionality.*

AR 790 (emphasis added).

Given ISC's rather sparse description of the proposed help desk operations, GSA's conclusion that ISC did not provide adequate outreach programs had a rational basis. In

addition, it was rational for GSA to conclude that the lack of a projected increase in the Help Desk level of support was a weakness, since the number of FBO users was expected to grow in the coming years. Accordingly, discerns no basis for revisiting this procurement decision. *See Bliss,* 77 F.3d at 449 (cautioning that courts should not enter the "minutiae" of the procurement process).

### b. The General Services Administration's Decision That The Past Experience Of Plaintiff's Proposed Staff Was A Personnel And Staffing Weakness Had A Rational Basis.

 GSA's decision that ISC's proposed staffing lacked prior PBSA ("Performance–Based Service Acquisition") experience is also questioned. *See* Pl. Mem. at 37 ("GSA cited as a Key Personnel, Staffing, Experience weakness the following: 'No prior direct [purely] PBSA experience.' [ ] GSA apparently chose to ignore the vast experience of ISC's long-time team members, SAIC, and the experience they bring with regard to PBSA contracting."). The Majority Report explained:

[ISC] has not identified prior past experience with PBSA on any past efforts.

\* \* \*

Although the Program Manager has experience supporting similar projects, these similar efforts have either been based on an indirect relationship with the government [sub-contractor to SAIC on the current FBO] or under smaller [size and scale] cost reimbursement type orders. Therefore, the proposed Program Manager does not have direct government PBSA firm fixed price experience.

Although asserted and characterized within the proposed offering in various ways, ISC has not identified any prior direct government PBSA experience under which it has previously performed. Therefore, the proposed *Program Manager does not have direct government PBSA experience.*

AR 802.

The Majority Report and GSA decided that there was a distinction between work experience of a prime contractor and that of a subcontractor. *Id.* at 801–02. On that basis, GSA concluded that because ISC did not have direct contracting experience on a PBSA fixed price contract, that was a relative weakness and increased the risk associated with ISC's overall performance. Since the underlying assumption was sound, GSA had a rational basis to identify the lack of relevant PBSA experience as an identified weakness.

### c. The General Services Administration Decision That Awardee's Proposal Warranted A Rating Of "Confident" Had A Rational Basis.

ISC also challenges the Minority Report's conclusion that Symplicity's Proposal warranted a confidence rating of "Confidence." *See* Pl. Supp. Br. at 18 ("The assignment of a confidence factor of 'Confident' to Symplicity's proposal by the Minority technical evaluation team lacked a rational basis."). Specifically, ISC asserts that, "[t]here are ... numerous material statements in the minority report that reasonably match up to a finding of 'Little Confidence' thereby making the undocumented assignment of a 'Confidence' rating unreasonable." *Id.* at 20.; *see also id* at 22–28. The Minority Report, however, concluded:

Symplicity has: exhibited an *acceptable understanding* of the SOO, IAE, and related business processes; an *acceptable Technical Approach* to meet the performance goals, objectives and outcomes of the project that is consistent with the proposed management approach and that adheres to the Statement of Objectives and all of the attachments.

AR 999 (emphasis added).

The Minority Report's conclusion that the Symplicity Proposal warranted rating of "Confident" rating was rational. *Id.* at 1000. Therefore, GSA had a rational basis to conclude that Symplicity's proposal warranted a rating of "Confident." *Id.*

### 9. The General Services Administration Did Not Waive Any Mandatory Requirements.

DEVIS argues that GSA waived mandatory requirements by not penalizing Symplicity

for failing to identify key personnel, pursuant to the terms of the Solicitation. *See* Int. Mot. at 33 ("GSA engaged in preferential treatment of Symplicity by waiving mandatory requirements when faced with plain deficiencies in the Symplicity proposal. For example, Symplicity's proposal never met the mandatory RFP requirement to provide information regarding designated Key Personnel and to commit to retaining personnel for at least the first year of contract performance."). Section L.8.2.3.1 of the Solicitation required the offeror to: "identify key positions by title and the personnel by name and who will fill them[.] ... The offeror shall provide resumes for key personnel." AR 251. Section H.1 of the Solicitation identified the key personnel positions:

| PERSONNEL | TITLE |
|---|---|
| (insert *names*) | Program Manager (or offeror's labor category equivalent) |
| (insert *names*) | System Implementation Manager (or offeror's labor category equivalent) |
| (insert *names*) | Senior Database Developer/Administrator (*or offeror's labor category equivalent*) |

AR 213 (emphasis added).

DEVIS contends that Symplicity did not properly identify a Senior Database Developer/Administrator ("DBA"). *See* Int. Mot. at 34 (arguing that Symplicity "refused to provide the information requested," when questioned by GSA about Symplicity's proposed DBA). The relevant facts follow.

On January 28, 2005, GSA sent a letter requesting that Symplicity provide a resume for Symplicity's proposed DBA. *See* AR 638–643. On February 1, 2005, Symplicity responded: "Please see the two attached resumes." Int. Mot. Ex. O.[32] The Majority and Minority Reports both discuss Symplicity's proposed DBA. The Majority Report stated:

*Symplicity provided as part of Clarification Responses resumes for two Database Administrators* (–[deleted]). The evaluation team did not receive a resume for one person, so it is unclear whether or not two or three DBA's are actually being proposed for this effort.

AR 836 (emphasis added).

The Minority Report, however, explained: In the latest round of questions, the government asked Symplicity to, 'Provide a resume for the proposed DBA as required by the RFP.' *Symplicity provided two resumes for the DBA position;* [deleted] *experienced with Oracle performance tuning using Symplicity's CSM line of products.*

AR 989 (emphasis added).

It seems clear that Symplicity identified two individuals for the DBA position: [deleted]. *Id.; see also* AR 836; Int. Mot. Ex. O.

Nevertheless DEVIS argues that:

The key point is that the 'Minority Opinion' approves a practice of using a 'placeholder' resume to 'establish[ ] a baseline for any subsequent DBA hired.' By assuming that it was acceptable for Symplicity to offer a 'placeholder' resume, the 'Minority Opinion' has waived the admittedly mandatory requirements that the offeror make a binding commitment to dedicate specific persons to a specific position as 'Key Personnel.' That is the whole point of including a 'Key Personnel' provision in an RFP.

Int. Mot. at 17.

Although DEVIS is correct that the Minority Report's "place-holder" explanation is inconsistent with the terms of the Solicitation, in fact Symplicity proffered the information required in its proposed DBA position. *See* AR 989 (The Minority Technical Report: "Symplicity provided two resumes for the DBA position"); *compare id., with* AR 836 (The Majority Technical Report: "Symplicity provided as part of Clarification Responses resumes for two Database Administrators"). Therefore, GSA did not waive any mandatory requirements, since Symplicity met the terms of the Solicitation by providing identification and resumes for the proposed DBA equivalent. *See* AR 213 (indicating that multiple personnel were acceptable and that the offeror could use a "labor category equivalent" to label the key personnel).

**10. The General Services Administration Did Not Improperly Consider Software Rights In Making A "Best Value" Decision.**

 ISC argues that GSA improperly considered "software rights" in making the

---

32. DEVIS' Memorandum in Support of Motion for Judgment on the Administrative Record, pro-

vided Exhibit O, a portion of the database referenced in note thirty-one.

"best value" award decision. *See* Pl. Mem. at 22; *see also* Pl. Reply at 12. In support, ISC proffered a December 5, 2005 Recommendation for Award wherein the SSA and CO reviewed a Software Rights Report prepared by Mitretek. *Id.* (citing AR 1206 & 1213). The December 5, 2005 Recommendation for Award stated:

> **OTHER REPORT (Provided under separate cover)**
>
> \* \* \*
>
> 4. Software Rights report: Mitretek (Independent Technical Advisor) is preparing a report regarding SW rights proposed by each offeror. The RFP requires the delivery of SW development documentation, including the source code. *This report regarding the viability and reliability of the alternate SW proposed.* [sic]

AR 1206 (emphasis added).

In relevant part, the December 5, 2005 "Best Value" Determination also provided that:

> **SYMPLICITY: Technical**
> **Rating "Acceptable"**
> **with Confidence**
>
> Factor 1—Technical Approach
> ● *Strengths*
>
> \* \* \*
>
> ● SympleObjects—application framework—should give Symplicity a technical advantage during development, maintenance & enhancement activities—less labor required than in a more traditional application development & integration approach—code reuse—proposes a beta new release of the new FBO prior to IOC—*will place source code in escrow.*

AR 1213 (italics added; bold and underlining in original).

According to ISC, the only reference to software source code in the Solicitation was in the contract delivery and performance requirements (*i.e.,* Section F of the Solicita-

tion), therefore the software source code was not an evaluation factor. *See* Pl. Mem. at 22–23. ("The only reference to an RFP requirement for delivery of software source code is not in the Statement of Objectives (and therefore properly evaluated) but in Section F. Deliveries and Performance. . . . In other words, the delivery of FBO Source Code was not an evaluated factor related to the Solicitation, but rather was a contract delivery requirement that the contractor could be required to meet at some point in the future."). ISC, however, neglects to enlighten the court as to why this is an issue.

The Government's explanation is that GSA may consider whether a contractor will comply with a contract deliverable when making a "best value" determination. *See* Gov't Opp. at 49 ("It is clear that GSA is entitled to determine whether the offeror's proposal agreed to provide the required contract deliverables. If an offeror refused to provide a deliverable, GSA could use that ground to eliminate the offeror from award consideration on grounds of responsiveness[.]").

Although a procuring agency is required to evaluate proposals only on factors specified in the Solicitation,[33] GSA was not precluded from evaluating whether an offeror will be able to meet contract delivery requirements, since Section F of the Solicitation provided:

> The following contract deliverables are a minimum requirement. The offeror is not limited to providing only those documents, and is encouraged to propose additional operational documentation as part of their proposed solution.
>
> \* \* \*
>
> The contractor at the direction of the Government shall deliver System and Services Documentation with each software version, system/software release, and system modification. The documentation, including all system source code and data, will include . . . F.4.5. (a) FBO Source Code.

AR 206–08 (emphasis added).

In this case, consideration of the software rights proposed by each offeror was relevant

33. *See* 10 U.S.C. § 2305(b)(1) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award *based solely on the factors specified in the solicitation.*" (emphasis added)); 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities *solely on the factors and subfactors specified in the solicitation.*").

to the evaluation of each offeror's performance. Therefore, the court has determined that GSA did not improperly consider software rights in making a "best value" award decision.

\* \* \*

### 11. The General Services Administration Violated Federal Acquisition Regulation 15.306(c) (Competitive Range).

#### a. The Contracting Officer Failed To Consider Price In Establishing The Competitive Range.

ISC and DEVIS assert that GSA violated FAR 15.306(c) by establishing the competitive range without evaluating the Proposals based on the all the factors identified in the Solicitation. *See* Amend. Compl. ¶ 21; *see also* Int. Supp. Br. at 22–35. Specifically, GSA did not consider price when setting the competitive range, contrary to the terms of the Solicitation. *See* Pl. Mot. at 10 ("GSA failed to evaluate price as part of the competitive range determination[.]" (certain alterations omitted)); *see also* Int. Supp. Br. at 22–35 ("Symplicity's proposal was plainly unacceptable and not responsive to the RFP requirements. Symplicity's proposal should have been rejected and excluded from the competitive range.").

FAR 15.306(c) provides, in relevant part:

(1) Agencies shall evaluate all proposals in accordance with 15.305(a), and if discussions are to be conducted, establish the competitive range. Based on the ratings of each proposal against *all* evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals, unless the range is further reduced for purposes of efficiency pursuant to paragraph (c)(2) of this section.

(2) After evaluating all proposals in accordance with 15.305(a) and paragraph (c)(1) of this section, the contracting officer may determine that the number of most highly rated proposals that might otherwise be included in the competitive range exceeds the number at which an efficient competition can be conducted.

48 C.F.R. § 15.306(c) (emphasis added); *see also* 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities *solely* on the factors and subfactors specified in the [S]olicitation." (emphasis added)).

The United States Court of Federal Claims has explained that, "this provision of the FAR replaced the previous provision governing the establishment of the competitive range, FAR 15.609(a), [which had] instructed the contracting officer to include only those proposals that had 'a reasonable chance of being selected.' " *Bean Stuyvesant, LLC v. United States,* 48 Fed.Cl. 303, 339–40 (2000) (citations omitted), *see also* 62 FED. REG. 51224, 51225–24 (Sept. 30, 1997) (summarizing the change from FAR 15.609(a) to FAR 15.305(c): "Emphasizing that no offeror, otherwise eligible to submit a proposal in response to a Government solicitation will be excluded from the competitive range without its proposal being initially reviewed and evaluated solely against all the evaluation factors and significant subfactors in the solicitation").

In this case, the Solicitation established that price was one of four evaluation factors. *See* AR 258 ("Price proposal(s) ... will be evaluated[.]"); *see also* AR 264 ("To ensure fair, reasonable, balanced, and realistic prices, the Government will perform a price analysis."). The Solicitation also provided that "[u]nrealistically low proposed price estimates may be grounds for eliminating a proposal from competition, either on the basis that the Offeror does not understand the requirements or the Offeror has made an unrealistic offer." AR 264. Likewise, Section L of the Solicitation stated that:

The Government may conduct negotiations with offerors whose proposals are determined to be within the competitive range. However, offerors are cautioned to submit proposals on the most favorable basis, as to *price,* delivery, or time of completion and other factors, since the government may elect to make an award without further discussion or negotiations.

AR 255 (emphasis added).

Accordingly, prior to GSA making the competitive range determination, all offerors

were required to submit comprehensive price proposals. In addition, the SSEP provided that, in establishing the competitive range, "all technical and *price* proposals *will be evaluated* [by the CO] for significant weaknesses and deficiencies." AR 66 (emphasis added). The CO also was required, pursuant to FAR 15.305(a) and FAR 15.306(c), to consider price in setting the competitive range, because price was one of the evaluation factors set forth in the Solicitation and the SSEP. *See Vantage Assocs., Inc. v. United States,* 59 Fed.Cl. 1 (2003) (analyzing FAR 15.305(a) and concluding that, "[a]gencies must evaluate proposals . . . based on the criteria stated in the Solicitation."); *see also Bean Stuyvesant,* 48 Fed.Cl. at 321 ("[T]he FAR require the agency to evaluate competitive proposals solely on the basis of the factors *specified in the solicitation* . . . . Consequently, this court may grant an offeror relief if the offeror establishes that the agency evaluated the proposal on a basis different than that announced in the solicitation[.]" (emphasis added)).

The CO, however, stated that "proposed prices were not a factor in determining the competitive range." AR 2538. The Government reads this statement as indicating that the CO, in effect, "considered price, but elected not to exclude any proposal on the basis of price, given pricing ambiguities in all offers." Gov't. Supp. Br. at 13. In addition, the Government, citing *Portfolio Disposition Mgmt. Group LLC v. United States,* 64 Fed. Cl. 1, 10 (2005), contends that "there is no evidence that the contracting officer abused his discretion in accepting Symplicity's proposal." Gov't Opp. at 37–8; *see also* TR at 126 ("We have a contracting officer who reasonably and rationally . . . said[:] . . . I'm not going to exclude based on price.").

■ Although the Government is correct in pointing out the breadth of discretion that a contracting officer is afforded in determin-

ing the competitive range,[34] the CO does not have discretion to ignore an evaluation factor that is set forth in the Solicitation when making the competitive range determination. *See* 48 C.F.R. § 15.306(c)(1). Nor has the Government identified any authority to the contrary. The court recognizes that the CO is afforded wide discretion, however, that discretion does not extend to violating the FAR and ignoring an integral factor in the procurement. The issue here is not whether discretion was abused or whether the CO acted unreasonably in accepting Symplicity's Proposal, but whether the CO considered price when setting the competitive range, as required by FAR 15.306(c).

■ In this case, the Administrative Record evidences that the CO did not analyze price as required by the Solicitation when establishing the competitive range. *See* AR 2538; *see also* AR 2387. The Government's argument to the contrary is not persuasive: "[O]ur position is that when the contracting officer [set the competitive range], he at least looked at price. He considered them. He knew what the prices were of the offerors at that point and acted rationally and reasonably." TR at 131; *see also id.* (Counsel for the Government: "Your Honor, we stipulated that the contracting officer did not consider price as part of his process in setting the competitive range. We have not stipulated to a violation of the FAR."). Whether the CO acted "rationally and reasonably" is not relevant to whether the FAR 15.305(c) was violated by the CO's decision to ignore prices in making the competitive range determination:

Proposed prices were *not* a factor in determining the competitive range. Due to the performance based nature of this acquisition, proposed solutions varied and therefore prices varied. *A determination, not to eliminate any proposal from the competitive range, based on price, was made*

---

34. *See Southfork Sys. v. United States,* 141 F.3d 1124, 1136 (Fed.Cir.1998) ("We have stated that '[a] contracting officer has broad discretion in determining competitive range, and such decisions are no disturbed unless clearly unreasonable'") (quoting *Birch & Davis Int'l, Inc. v. Christopher,* 4 F.3d 970, 973 (Fed.Cir.1993) (alteration in original)); *see also Portfolio Disposi-*

*tion,* 64 Fed.Cl. at 10 ("A protestor carries a heavy burden in establishing that an agency improperly included an offeror in the competitive range for award of a contract."); *Cubic Defense Systems, Inc. v. United States,* 45 Fed.Cl. 450, 460 (1999) ("The SSA has considerable discretion in determining whether to eliminate an offeror from the competitive range.").

**116**

*by the FBO Contracting Officer.* The Contracting Officer concluded that once the competitive range was determined and technical discussion/price negotiations commenced, offerors could adjust their prices accordingly, which could result in lower prices than initially proposed by each offeror.

AR 2538 (emphasis added).

Therefore, the Government's argument that the CO considered prices and then decided not to exclude on that basis is simply not supported by the Administrative Record.

Assuming *arguendo* that the CO subjectively considered price, the competitive range determination nevertheless is still invalid, as there was no consideration of price realism or price reasonableness. The Solicitation required that all prices be analyzed for both. *See* AR 264; *see also* AR 2537 ("Prices will be evaluated for realism, reasonableness and an indication of compatibility between the proposed prices and proposed scope and effort."). The CO's failure also violated FAR 15.306(c), that requires the CO to rate each Proposal "against all evaluation criteria." 48 C.F.R. § 15.306(c)(1). Although the CO may have intended that "once the competitive range was determined . . . offerors could adjust their prices accordingly[,]" FAR 15.306(c)( ) requires that the competitive range may only consist of "the most highly rated proposals." AR 2538; *see also* 48 C.F.R. § 15.306(c)(1). Therefore, DEVIS is correct in pointing out that the CO "was making a competitive range determination, which by its very nature is a decision to exclude some offerors and to hold discussions with other offerors and allow them to revise their proposals." Int. Supp. Br. at 32. Moreover, if the price supplied by an offeror was, in fact, so confusing as to make it impossible to analyze, as the Administrative Record suggests may have been the case, then the CO should have sent out a request for each offeror to clarify their proposal before setting the competitive range. *See Firearms Training Sys., Inc. v. United States,* 41 Fed.Cl. 743, 747 (1998) ("[N]othing in . . . the FAR would preclude the contracting officer, after performing an initial evaluation of the proposals, from postponing the competitive

range determination."). For these reasons, the court has determined that the GSA violated FAR 15.306(c) in establishing the competitive range.

**b. Plaintiff And The Intervenor Were Prejudiced.**

██ In addition to establishing a violation of the law, a protestor must also show that the violation caused prejudice. *See Bannum,* 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review . . . then it proceeds to determine, as a factual matter, if the bid protestor was prejudiced by that conduct."); *see also Data Gen. Corp.,* 78 F.3d at 1562 ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). In order to demonstrate that the violation caused prejudice, the protestor must show that it had a substantial chance of receiving the contract but for the violation. *See Bannum,* 404 F.3d at 1351 ("To establish prejudice Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process."). The court has concluded that both ISC and DEVIS, would have had a "substantial chance" of being awarded the contract absent the CO's violation of FAR 15.306(c). Therefore, both parties were prejudiced by the violation.

The Government argues that, even if the court were to find a violation of the law, there was no prejudice. *See* Tr. at 132 (Counsel for the Government: "But if the Court finds we did not consider price, we think that at worst this is a hypertechnical violation that resulted in increased competition. It resulted in the inclusion of a proposal that generated more competition for the government, and this is hardly problematic."). In fact, the Government suggests that "Symplicity's proposal would have been included in the competitive range even if the CO had considered price in setting the competitive range. . . . Using price as a factor in determining the competitive range might have *increased* the attractiveness of Symplicity's proposal[.]" Gov't. Opp. at 35; *see also* TR at 136 (Counsel for the Government: "ISC is not challenging exclusion. A whole different ballpark. A whole different can of

worms. It's challenging inclusion, and if you look at the FAR and look at cases that have interpreted that, and what it talks about is the very large amount of discretion the contracting officer had in choosing offerors for the competitive range. It's not the award."). The initial price evaluation that the CO relied on in making the competitive range determination, however, contradicts the assertion that price considerations would have increased the attractiveness of Symplicity's offer: "We were not able to determine realistic pricing from Symplicity for each CLIN on initial proposals, however, based on the pricing provided *we attempted a best guess.*" AR 2387 (emphasis added); *see also* AR 2388 (indicating that Symplicity's price submissions were incomprehensible and ambiguous). Given the Solicitation's requirement of both a price realism analysis and price reasonableness analysis, there is a substantial chance that had the CO considered price, as required, Symplicity's Proposal would not have been included, because the CO excluded four of the eight offerors on other proposal deficiencies. *See* AR 2537 (indicating that the CO excluded Proposals based on technical deficiencies). The fact that the Price Team could not determine "realistic pricing" from Symplicity's proposal evidences failure to meet the requirements of the Solicitation. Furthermore, the price that was estimated for Symplicity's Proposal was [deleted], in contrast to an average price of [deleted] for the other seven bidders. *See* AR 2538. Therefore, the court rejects the Government's assertion that it is speculative to conclude that Symplicity would have been excluded from the competitive range, because the CO would have likely determined that such an ambiguous and low price submission was an indication that Symplicity misunderstood the procurement. *See* AR 264 ("Unrealistically low proposed price estimates may be grounds for eliminating a proposal from [the] competition, either on the basis that the Offeror does not understand the requirements or the Offeror has made an unrealistic offer.").

Even if consideration of Symplicity's Price Proposal in setting the competitive range likely would have required exclusion, both ISC and DEVIS must show that their Proposals would have remained in the competitive range to show prejudice. The Government argues that price considerations would have "decreased the attractiveness of ISC's proposal, and perhaps reduced the probability that ISC would have been selected in the competitive range." Gov't. Opp. at 35. The basis for this contention is that ISC's initial Price Proposal was [deleted] of the four offerors in the competitive range. The Administrative Record, however, indicates that ISC would have been included in the competitive range notwithstanding price considerations. As mentioned above, the average price proposal of the offerors, excluding Symplicity, was [deleted]. *See* AR 2538. ISC's proposal was almost [deleted] than this average. *See Id.* Moreover, the Government estimated the cost of the Contract at roughly [deleted]. *See* AR 4 ("The FBO system Life–Cycle Cost Estimate ... over the potential 8–year term of the contract is approximately [deleted]."). Therefore, ISC's initial Price Proposal, was not unreasonable, requiring exclusion.

DEVIS's Proposal was priced at [deleted]. *See* AR 2538. This was the second lowest price in the competitive range and is approximately one-half the [deleted] estimated price. *See* AR 4. Moreover, there is nothing in the Administrative Record or the CO's competitive range determination indicating that DEVIS's Price Proposal either was deficient or flawed. *See* AR 2383–429; *see also* AR 2535–39. Therefore, DEVIS's price proposal also would have remained in the competitive range, if price had been considered.

Finally, the Government argues that ISC was not prejudiced, because ISC's pricing of an option year was ambiguous. *See* Tr. 125 ("ISC proposed [deleted] for CLIN 0002, and it was not clear whether the option is [deleted] to the government[.]"). The court, however, is not persuaded by this argument for two reasons. First, ISC *priced* the option year at [deleted], contradicting the Government's assertion that ISC failed to price the option. *See* AR 1751. Second, the price of [deleted] was maintained throughout the entire procurement. *See* AR 2410. The price realism and price reasonableness analyses, required by the Solicitation, would have provided the CO with the opportunity to verify any question the CO may have had.

The CO's failure to consider price as a factor in determining the competitive range,

greatly increased Symplicity's chances of being included in the competitive range. In fact, given Symplicity's low initial price proposal, its bid likely would have been excluded had the CO conducted the required price analysis. The subsequent inclusion of Symplicity's initial proposal in the competitive range, significantly reduced the likelihood that either ISC or DEVIS would receive the contract. Only four proposals were selected for inclusion in the competitive range. *See* AR 2539. Absent Symplicity's inclusion in the competitive range, ISC and DEVIS would both have had a "substantial chance" of being awarded the contract. Therefore, the court has determined that ISC and DEVIS were prejudiced by the CO's violation of FAR 15.306(c).

### 12. The General Services Administration Violated Federal Acquisition Regulation 15.308 (Comparative Assessment, Independent Judgment, Documentation For Rationale).

#### a. The Source Selection Authority Engaged In A Comparative Assessment.

ISC and DEVIS contend that the Source Selection Authority's decision violated the

FAR 15.308 [35] for three reasons: 1) the SSA did not engage in a comparative assessment of the Proposals against the factors set forth in the Solicitation; 2) the SSA did not exercise independent judgment; and 3) the SSA did not adequately document the rationale for business judgments and tradeoffs. *See* Int. Reply at 9 ("Intervenor's opening brief cited three violations of FAR 15.308 in the decision to award the contract to Symplicity."); Pl. Supp. Br. at 2–3 ("In essence, FAR 15.308 requires the following for a proper SSA award decision: [1] ] A comparative assessment of proposals against all solicitation source selection criteria; [2] ] A decision based on independent judgment; and [3] ] A documented decision that includes the rationale for business judgments and tradeoffs made. The source selection decision, in this instance, failed to meet each of these requirements.").

First, ISC and Devis argue that the Source Selection Decision [36] did not engage in a comparative assessment of the Proposals against the factors set forth in the Solicitation. *See* Pl. Supp. Br. at 3 ("There was no comparative assessment of proposals against all source selection criteria." (emphasis omit-

---

**35.** FAR 15.308 provides:

> The source selection authority's (SSA) decision shall be based on a *comparative assessment of proposals against all source selection criteria in the solicitation.* While the SSA may use reports and analyses prepared by others, *the source selection decision shall represent the SSA's independent judgment.* The source selection decision shall be documented, *and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA,* including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

48 C.F.R. § 15.308 (emphasis added).

**36.** At the March 1, 2006 Oral Argument, the court questioned whether multiple documents could constitute "final" agency decision subject to judicial review. *See* TR. at 215–22. The Government's post-hearing brief advised that, "there is no legal authority or regulatory impediment to this Court's consideration of multiple documents as the reviewable final agency decision." Gov't. Supp. Br. at 11 (arguing that the "Determination that Proposals Received from Two Offerors be

Considered Technically Acceptable", the "Recommendation for Award," and the "Best Value Determination" together constituted the agency's "final decision.")

Decisions of the United States Court of Federal Claims have accepted the position that, the court may consider "the *record as a whole,* the [SSA's] conclusion ... was rational and supported." *Ryder Move Mgmt., Inc. v. United States,* 48 Fed. Cl. 380, 388 (2001) (emphasis added); *see also TLC[TLT] Constr. Corp. v. United States,* 50 Fed. Cl. 212, 213 (2001) ("The proper standard is whether the agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law *based on the administrative record.*" (emphasis added)). FAR 15.308 explicitly references the SSA's "decision," without mention which documents constitute the "final decision." 48 C.F.R. § 15.308.

In this case, the court, accepts the Government's position. *See* AR 1206 (Recommendation for Award: "The 'Recommendation for Award Process' ... included *three documents* [see above] generated by the CO for SSA approval/concurrence." (emphasis added)); *see also* AR 1209 (indicating that the "Best Value Determination" document was an attachment to the "Recommendation for Award.").

ted)); *see also* Int. Supp. Br. at 6 ("[T]here is nothing in the Administrative Record that shows any such comparative analysis[.]" (emphasis omitted)); *see also* 48 C.F.R. § 15.308 ("The Source Selection Authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation.").

The United States Court of Federal Claims has held that agencies have a limited degree of latitude in complying with FAR 15.308. *See Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 320 (2002) (holding that as long as the agency evaluators conducted a contract-by-contract assessment, the SSA may rely on this evaluation without performing the same detailed analysis); *see also Dismas Charities, Inc. v. United States,* 61 Fed.Cl. 191, 207 (2004) ("Despite the fact that the SSDD [Source Selection Decision Document] does not contain such a direct comparison, the record supports the conclusion that BOP carefully weighed the strengths and weaknesses of each offerors' Past Performance in a comparative manner."). In order to comply with FAR 15.308, the SSA must only engage in some *sort* of comparative assessment and document those findings. *Id.*

In this case, the Administrative Record indicates that the SSA did, in fact, engage in a comparative assessment of the offerors' Proposals:

As part of the trade-off analysis, the strength of the Devis proposal, which included early implementation, hardware architecture, data archive strategy, software architecture, functionality, transition planning, management and key personnel were reviewed by the Program Office and found to be attractive, however, it was determined that there is no rationale for spending an additional [deleted] for the perceived technical strengths of the Devis proposal. A trade-off for the non-cost factors could not justify the price premium when we believe that Symplicity can provide an *acceptable technical solution* that fulfills the Government's requirements at a significantly lower price.

\* \* \*

As part of the trade-off analysis, the strengths of the ISC proposal, [which] includes its experience as the incumbent subcontractor, a proposal for early implementation, strong interagency coordination, plans for maintaining existing and familiar interfaces, partnering with IMSI for C & A process, maximizing return on investment in the current FBO, understanding of the issues associated with the software development life cycle, approach to delivering software, management, and key personnel were reviewed by the Program Office and found to be attractive, however it was determined that there is no rationale for spending an additional [deleted] for the perceived technical strengths of the ISC proposal. A trade-off for the non-cost factors, including past experience, could not justify the price premium, when we believe that Symplicity can provide an *acceptable technical solution* that fulfills the Government's requirements at a significantly lower price.

AR 1224; *see also* AR 1210–15 (documenting the various technical benefits associated with each offeror). Moreover, the technical reports provided to the SSA contain a detailed assessment of every Factor and Subfactor mentioned in the Solicitation. *See* AR 745–72; *see also Computer Sciences,* 51 Fed.Cl. 297, 320 ("[A]s long as the agency evaluators conducted a contract-by-contract assessment, the SSA may rely on this evaluation *without performing* the same detailed analysis." (emphasis added)). Accordingly, the court concludes that the SSA's proffered comparative assessment, combined with the technical reports furnished to the SSA, are sufficient to satisfy the first part of FAR 15.308, even if the court were to disagree with the content and scope of the SSA's comparative analysis. *See Dismas Charities,* 61 Fed.Cl. at 207 ("While the SSDD could, perhaps, been more artfully crafted, it complies with the requirements of FAR § 15.308.").

**b. The Source Selection Authority Did Not Exercise Independent Judgment And Document That Exercise.**

Second, ISC and DEVIS argue that the Source Selection Decision did not repre-

sent the SSA's independent judgment. *See* Pl. Supp. Br. at 16 ("There is no evidence in the record that the award decision was based on the SSA's independent judgment." (emphasis omitted)); Int. Supp. Br. at 8 ("The Government cannot point to any substantial contemporaneous evidence that the SSA applied any independent judgment regarding the source selection decision."); 48 C.F.R. § 15.308 ("[T]he source selection decision shall represent the SSA's independent judgment."). The United States Court of Federal Claims has reiterated the FAR's requirement of independent judgment: "A contracting officer should exercise her discretion *independently* and in an informed manner." *OTI Am.*, 68 Fed.Cl. at 657 (emphasis added); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed.Cl. 421, 427 (2002), *on remand from Impresa*, 238 F.3d 1324 ("[T]he contracting officer ... failed to conduct an *independent* and informed ... determination. The testimony of the contracting officer indicates that he relied on the recommendation of the technical evaluation board[.]" (emphasis added)). The Comptroller General also has discussed the independent judgment element of FAR 15.308:

> Although source selection officials may reasonably disagree with the ratings and recommendations of evaluators, they are nonetheless bound by the *fundamental requirement* that their *independent judgments* be reasonable, consistent with the stated evaluation scheme and adequately documented.

*Matter of Dyncorp Int'l. LLC*, No. B–289,-863, 2002 CPD ¶ 83, 2002 WL 1003564 (GAO May 13, 2002) (emphasis added).

In this case, the Administrative Record does not evidence that the SSA exercised independent judgment in raising Symplicity's rating from "Unacceptable" to "Acceptable" and ISC's rating from "Marginal" to "Acceptable." It is true that the decision to raise the technical ratings of Symplicity and ISC was preceded by a six page summary of the Majority and Minority technical findings. *See* AR 1190–96 ("The details below are the *responses of the minority report* to areas

that the majority report cited as reasons for the low technical score." (emphasis added)). Most of those six pages, however, were a verbatim restatement of the Minority Report. *Compare* AR 1045 ("Symplicity's staffing approach to propose both technical and user interface leads as 'key' in lieu of a Database Developer/Administrator is allowable and acceptable."), *with* AR 988 ("Symplicity's staffing approach to propose both technical and user interface leads as 'key' in lieu of a Database Developer/Administrator is allowable and acceptable."). After copying from the Minority Report, the SSA wrote:

> The SSA, after a review of the minority opinion report and the independent technical advisor's report, agrees with the minority reports and their criticisms of the Majority report, and that the proposals received from ISC Corporation and Symplicity Corporation be considered acceptable.

AR 1197. The only substantive justification that the SSA provided for raising the technical ratings of ISC and Symplicity was based exclusively on plagiarism of the Minority Report.

The Government counters that the SSA's wholesale adoption of the Minority Report is analogous to a reviewing appellate court affirming a trial court's decision on the sole basis of the lower court's reasoning: "If the [United States Court of Appeals for the] Federal Circuit were to say ISC has raised issue X for all the reasons described and discussed by Judge Braden in her thorough and detailed opinion we agree." TR at 92. The FAR, however, plainly requires the SSA to use *independent judgment*: "While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's *independent judgment.*" 48 C.F.R. § 15.308 (emphasis added); *see also OTI Am., Inc.*, 68 Fed.Cl. at 657 ("A contracting officer should exercise her discretion *independently* and in an informed manner." (emphasis added)). In this case, the SSA did not document how independent judgment was exercised.[37]

The Government further argues:

> terms of the SSEP by not exercising and docu-

37. DEVIS also alleges that the SSA violated the

[W]hile the SSA agreed with and adopted much of the reasoning of the CO and Minority Report authors, this is hardly improper. Again, FAR 15.308 contemplates this. Devis' complaint is inconsistent with the FAR and would have the SSA rewrite and rephrase opinions to satisfy a requirement that does not exist in the FAR or SSEP.

Gov't. Opp. at 19. The Government, however, confuses the degree of agreement contemplated by the FAR with the degree of agreement demonstrated by the SSA in this procurement. Although the FAR contemplates that decisional authority may be supported by other procurement officials, nevertheless, FAR 15.308 requires evidence of the exercise of independent judgment. Therefore, the SSA simply can agree with the reasoning of the CO or Minority Report, but only if the SSA provides an independent *rationale* for that agreement. *See* 48 C.F.R. § 15.308 ("[T]he documentation shall include the *rationale* for any business judgments . . . relied on by the SSA." (emphasis added)). The SSA could have met the FAR requirement by stating: I agree with the Minority Report *because of reasons X, Y, Z.* Instead, the SSA wrote, "The SSA . . . agrees with the minority reports, and that the proposals received from ISC Corporation and Symplicity Corporation be considered acceptable." AR 1197. The SSA's reasons for relying on the Minority Report, are not documented in

the Administrative Record. Therefore, the court has determined that the SSA violated FAR 15.308.

**c. Plaintiff and Intervenor Were Prejudiced.**

In addition to establishing a procurement violation, a protestor must also show that the violation caused prejudice. *See Bannum,* 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review . . . then it proceeds to determine, as a factual matter, if the bid protestor was prejudiced by that conduct."); *see also Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). Prejudice in the context of a violation of FAR 15.308 requires that the protestor's chances of receiving the contract be increased, if the SSA complied with the FAR. *See Bannum,* 404 F.3d at 1538 ("To establish prejudice [the protestor is] required to show that there was a 'substantial chance' it would have received the contract award but for the . . . errors in the bid process."). As a factual matter, both ISC and DEVIS were prejudiced by the SSA's failure to document the exercise of independent judgment, since that failure resulted in Symplicity's Proposal receiving a higher rating than the ISC and DEVIS Proposals:

| | MAJORITY REPORT | | SSA DETERMINATION | |
| --- | --- | --- | --- | --- |
| | Adjectival Rating | Confidence Rating | Adjectival Rating | Confidence Rating [38] |
| *DEVIS* | Excellent | Significant Confidence | Excellent | N/A |

menting independent judgment. *See* Int. Mot. at 30 ("The award decision also violated the terms of the Source Selection Evaluation Plan because the SSA failed to '[i]ndepedently select, in writing, the source or sources whose proposal represents the best value for the Government.' "). In relevant part, the SSEP requires that the SSA "[i]ndependently select[ ], in writing the source or sources whose proposals represent the vest value for the Government." AR 34–35. This requirement is identical to the requirement set forth in FAR 15.308. *Compare id., with* 48 C.F.R. § 15.308 ("While the SSA may use reports

and analyses prepared by others, *the source selection decision shall represent the SSA's independent judgment.* The source selection decision *shall be documented,* and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA." (emphasis added)).

38. The SSA did not mention or analyze confidence ratings in the "Determination that Proposals Received from Two Offerors be Considered Technically Acceptable."

| ISC | Marginal | Confidence | Acceptable | N/A |
|---|---|---|---|---|
| Symplicity | Unacceptable | Little Confidence | Acceptable | N/A |

AR 1189–97 (emphasis added).

██ As this table demonstrates, the Majority Report determined there was a distinction between the Technical Proposals of ISC and Symplicity, since the ISC Proposal was rated one step above the Symplicity Proposal. *See* AR 1189. After the flawed SSA Determination, however, the original disparity between the ISC and Symplicity Proposals became irrelevant since both were rated "Acceptable." *See* AR 1197. Therefore, ISC was prejudiced by the SSA's failure to document the exercise of independent judgment, since ISC's chances of receiving the FBO award would have increased, but for the error in the bid process. *See Bannum,* 404 F.3d at 1538.

██ The Majority Report also determined there was a distinction between the Technical Proposals of DEVIS and Symplicity, since the DEVIS Proposal was rated three steps above the Symplicity Proposal. *See* AR 1189. After the flawed SSA Determination, however, the DEVIS Proposal was only rated one level higher than the Symplicity Proposal. *See* AR 1197. Therefore, DEVIS also was prejudiced by the failure of the SSA to document the exercise of independent judgment, since DEVIS' chances of receiving the FBO award would have increased, but for the error in the bid process. *See Bannum,* 404 F.3d at 1538.

### 13. The General Services Administration Misrepresented Findings, But Was Not Prejudiced.

Separately, DEVIS argues that the justification the SSA provided to raise the techni-

cal rating of Symplicity was based on factual misrepresentations of the technical reports. *See* Int. Mot. at 31 ("[I]n order to justify the decision to increase the ratings of Symplicity's proposal, the document signed by the SSA and the CO makes the factual assertion that '*all* evaluators agree on the rating of acceptable for the Management and other factors for Symplicity.' ... The factual premise of the SSA's ... decision was wrong." (emphasis added; internal citations omitted)). In the December 2, 2005 Source Selection Decision Document, the SSA stated: "Although the minority opinion also addresses the differences of opinion regarding Technical Evaluation Factors 2 through 4, (Management Approach, Past Performance and Key Personnel Staffing and Experience respectively) *all evaluators agree on the rating of 'acceptable' for these evaluation factors.*" AR 1194 (emphasis added).

The court's independent review of the technical evaluation reports reveals that three out of the seven technical evaluators rated Symplicity's Management Approach as "Marginal." *See* Int. Mot. Ex. F.[39] The Government argues that "[w]hen the CO and SSA referred to 'all evaluators' in their written decision to consider the Symplicity proposal technically acceptable, they were obviously referring to the *consensus* evaluation of the Technical Evaluation Team[.]" Gov't Opp. at 22 (emphasis in the original). The court, however, agrees with DEVIS that the plain meaning of the word "all" signifies that there was unanimity among the technical evaluators. *See* Int. Mot. at 13 (arguing that the Government's reading of the word "all" is, "contrary to its plain meaning and contrary

39. On January 31, 2006, the court entered an order requiring the Government to supplement the Administrative Record with a compact disc of a Lotus–Notes database, containing the individual comments of the evaluators and advisors, as well as other materials related to the procurement. *See* Ct. Order, *Information Sciences Corp. v. United States,* No. 05–1342C (Fed.Cl. January 31, 2006). That Order provided: "Given the volume and format of information on the database, the materials will not printed and numbered. Instead, to the extent materials from the database are relied upon during the briefing process, the parties are to attach copies of cited documents to their briefs." *Id.* DEVIS provided Exhibit F, a portion of that database in DEVIS' Memorandum in Support of Motion for Judgment on the Administrative Record.

to common sense."); *see also* AR 1194 (*"all* evaluators agree on the rating of 'acceptable' for these evaluation factors."). By misrepresenting the factual findings of three technical evaluators, the December 2, 2005 Source Selection Decision Document *ipso facto* did not have a rational basis. *See State Farm Mut. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856 ("Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem, *offered an explanation for its decision that runs counter to the evidence before the agency,* or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." (emphasis added)); *see also OTI Am., Inc.,* 68 Fed. Cl. at 653 (quoting the same and applying the Supreme Court test to a bid-protest action).

In addition, DEVIS argues that the justification provided by SSA to raise the technical rating of ISC was based on a factual misrepresentation of the technical reports. *See* Int. Mot. at 32 ("[I]n order to justify the decision to increase the ratings of ISC's proposal, the document signed by the SSA and CO makes the factual assertion that 'the entire evaluation team agreed to a confidence rating of "Confident" for ISC's technical proposal. . . . However, the record shows several evaluators actually gave ISC's proposal a confidence rating of "Little Confidence." ' "). The December 2, 2005 Source Selection Decision Document provided: "Despite the 'marginal' rating given to the offeror's proposal by the majority opinion holders, the *entire technical evaluation team* agreed to a confidence rating of 'Confident.' " AR 1190 (emphasis added). The Administrative Record states the otherwise: "The *consensus* Technical Rating is "Marginal" with *"Little Confidence."* AR 774 (emphasis added). By misrepresenting the factual findings of technical evaluators, the Source Selection Decision Document *ipso facto* did not have a rational basis, because the document contained information that was contrary to the actual findings of the evaluators. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856 ("Normally, an agency rule would be arbitrary and capricious if the agency . . . *offered an explanation for its decision that runs counter to the evidence before the agency[.]"* (emphasis added)); *see also OTI Am., Inc.,* 68 Fed.Cl. at 653 (quoting the same and applying the Supreme Court test to a bid-protest action).

 The court, however, has determined that DEVIS was not prejudiced by the two misrepresentations in the December 2, 2005 Source Selection Decision Document. One of these misrepresentations relates to the ISC Proposal, *i.e.,* the assertion that the entire technical team agreed to a confidence rating of "Confident" for the ISC Technical Proposal. Since ISC was not the awardee of the FBO contract, DEVIS did not have a "substantial chance" to receive the contract, but for the erroneous restatement of ISC's confidence rating. The correct classification of the ISC Proposal would not have had any bearing on the Symplicity Proposal, and, therefore, would not have increased the likelihood of DEVIS winning the contract award. Accordingly, the court has determined that DEVIS was not prejudiced by the SSA's misstatement of ISC's confidence rating. *See Bannum,* 404 F.3d at 1538; *see also Galen Med. Assocs.,* 369 F.3d at 1331 ("The burden is therefore on the plaintiff to show that, but for the alleged error in the procurement, it likely would have been awarded the contract.").

 Although the second identified misrepresentation relates to the Symplicity Proposal, DEVIS has not established prejudice. The December 2, 2005 Source Selection Decision Document contained thirteen separate Minority Report rebuttals that the SSA considered when making the determination to raise Symplicity's technical rating. *See* AR 1994–97. Therefore, it is speculative to presume that the SSA's misstatement of the evaluators' rating of Symplicity's Management Approach led to the SSA raising the technical rating of Symplicity. Since there were thirteen other grounds that the SSA cited as reasons for deciding that the Symplicity Proposal acceptable, DEVIS cannot establish a "substantial chance" that it would have received the contract, but for this single error. Accordingly, the court has determined that DEVIS was not prejudiced by the SSA's misstatement of Symplicity's Management Approach rating. *See Bannum,* 404

F.3d at 1538; *see also Galen Med. Assocs.*, 369 F.3d at 1331 ("The burden is therefore on the plaintiff to show that, but for the alleged error in the procurement, it likely would have been awarded the contract.").

### 14. The General Services Administration's Decisions That Did Not Have A Rational Basis, But The Intervenor Was Not Prejudiced.

#### a. The General Services Administration's Decision That Plaintiff Did Not Provide An Adequate Incentive Structure Did Not Have A Rational Basis.

■ ISC argues that the weakness identified by the evaluators regarding ISC's incentive structure was unreasonable and did not have a rational basis. *See* Pl. Mem. at 37 ("GSA cited as a Management Approach weakness the following: '[o]utreach mechanism and training methods during Q & M removed from final proposal.' . . . In reality, ISC specifically addressed outreach mechanisms in its proposal."). The Government concurs: "We agree that the weakness identified by the evaluators in ISC's incentive structure was not a true deficiency." Gov't. Opp. at 54. Therefore, the court has determined that this identified weakness did not have a rational basis.

#### b. The General Services Administration's Decision That Plaintiff's Proposed Staffing Was Excessive Did Not Have A Rational Basis.

ISC also argues that GSA's decision that ISC's proposed staffing was excessive was unreasonable and lacks a rational basis. *See* Pl. Mem. at 35 ("It is also unreasonable for GSA to conclude that the options contained 'excessive amounts of labor.' "). The Administrative Record, however, failed to ascertain any evidence of excessive staffing to corroborate the GSA's assertion. The United States Court of Appeals for the Federal Circuit has held that: "[T]he test for reviewing courts is to determine whether 'the contracting agency *provided a coherent and reasonable explanation of its exercise of discretion*[.]' " *Impresa*, 238 F.3d at 1332 (emphasis added; citations omitted). Since, GSA provided no explanation of how it reached the conclusion that ISC proposed staffing was excessive, the court has determined that this identified weakness did not have a rational basis.

#### c. Plaintiff Was Not Prejudiced By These Errors.

The court has determined that, of all weaknesses disputed by ISC, two did not have a rational basis. The United States Court of Appeals for the Federal Circuit, has held that the trial court must determine whether such errors caused prejudice. *See Bannum*, 404 F.3d at 1353 ("The trial court [is] required to determine whether . . . errors in the procurement process significantly prejudiced Bannum."). Accordingly, ISC has the burden to establish prejudice, *i.e.*, that it had a "substantial chance" of being awarded the FBO award, but for GSA's miscategorization of the incentive plan and proposed staffing. *Id.* at 1358 ("To establish prejudice [a protestor is] required to show that there was a 'substantial chance' it would have received the contract but for [the agency's] errors in the bid process.").

Regarding these GSA errors, in the court's judgment, ISC has not met that burden. *See JWK Int'l Corp. v. United States*, 279 F.3d 985, 989 (Fed.Cir.2002) ("To prevail in its bid protest, [the protestor] *must additionally show* that any significant error in the procurement process prejudiced the award." (emphasis added)). First, the Administrative Record does not evidence that the SSA relied on these identified weaknesses when making the "best value" determination, since there is no mention of any weaknesses in the decisional documents. *See* AR 1189–1225. Although these weaknesses are mentioned in the post-award de-briefing, the administrative record reveals that no alleged in-depth analysis of the offeror's proposal was undertaken. *See* AR 2365 ("A Debriefing is NOT: A page-by-page analysis of the offeror's proposal[.] . . . *A debate or defense of the government's evaluation results* [.]") ·(emphasis added). Accordingly, ISC's, Post Hearing Brief, concedes that this violation did not result in any prejudice:

> The government now admits that this was improperly classified as a weakness. . . .

The government argues, however, that no prejudice can be shown by ISC as a result of this improper evaluation because the SSA did not mention this weakness in the decision memorandum. Under that theory of proof, SSAs would be able to improperly evaluate proposals as long as they did not mention the improper evaluation in the decision memorandum. *Neither counsel for ISC nor counsel for the government can determine how the SSA would have made the best value decision had the proper evaluation been conducted* [.]

Pl. Supp. Br. at 43 (emphasis added).

Likewise, it is impossible for the court to determine how the SSA's "best value" determination might have been different had the evaluators not identified these two weaknesses. Although the court is cognizant of ISC's concern that SSA failed to explain how the weaknesses associated with each offerors' proposal affected his "best value" determination, this situation does not *per se* satisfy ISC's burden of establishing that the SSA relied on the two weaknesses, *i.e.,* prejudice.[40]

On the other hand, assuming that the SSA relied on the weaknesses identified in the post-award briefing, ISC has not satisfied the burden of proving there is a "substantial chance" that the contract would be awarded to ISC. The United States Court of Appeals for the Federal Circuit has determined that: "Small errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.... [O]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations." *Widnall,* 15 F.3d at 1048 (citations omitted). In this case, in addition to the seven weakness identified by ISC, the Majority Report identified *at least* twenty-two additional weaknesses in ISC's Proposal:

| Weakness Number | AR Page | Summary of Weakness |
|---|---|---|
| 1, 2 | 775 | ISC did not propose to use an application server in the new FBO architecture; the technical architecture is described in generic terms. |
| 3 | 779 | ISC did not modify its Technical Proposal to reflect the change in its revision dated January 28, 2005. |
| 4 | 779 | The relocation of the MyFBO vendor personalization reduces the functionality and attractiveness of CLIN 0001. |
| 5 | 781 | ISC proposes to provide an alternative to the IAE portal based on BEA WebLogic. However, ISC doesn't propose a new application server. |
| 6 | 781 | ISC's proposed technical approach conflicts with their Business Proposal. |
| 7 | 781 | ISC proposed minimal creative and innovative solutions for the future, and there will be significant carry-over from the old FBO system. |
| 8 | 783 | ISC did not adequately explain their plans to provide a "technology refresh." |
| 9 | 784 | ISC proposed "Webinars." However, there is no plan or schedule to support implementation of this proposed activity. |
| 10 | 784 | ISC provided no explanation for why agency/customer transition and migration has been removed from their Technical Proposal. |
| 11 | 785 | ISC proposes a demo server which is separate from the production environment. There are risks with trying to keep these servers 'in synch.' |
| 12, 13 | 786 | The lack of refresh specificity puts both parties at risk for additional cost; the lack of LRAR specificity puts both parties at risk for additional cost. |
| 14 | 789 | ISC has not demonstrated a clear technical approach to FedTeDS. |
| 15 | 790 | ISC's technical approach will not utilize CCR's real time XML capability, which may degrade the usability of FedTeDS. |
| 16 | 793 | The ease of installation, operation, and maintenance of the new FBO is not addressed in detail; there is no mention of website content management. |
| 17 | 793 | ISC's described enhanced functions to not go beyond standard features. |
| 18 | 796 | ISC's waterfall method is not well suited for web development projects such as the FBO procurement. |
| 19 | 797 | ISC's Incentive Plan proposes an automatic positive incentive. However, the |

---

40. ISC's complaint that the SSA improperly evaluated proposals, because the SAA did not mention an improper evaluation in a decisional memorandum is misplaced. In this procurement, the SSA failed to comply with the FAR, as a result, in part, of inadequate documentation. As discussed herein, there are other mechanisms in place to ensure that the SSA does not misrepresent technical evaluations.

| | | |
|---|---|---|
| | | Solicitation allows offerors to propose only negative incentives. |
| 20 | 797 | ISC's proposed quality assurance plan puts the Government at risk. |
| 21 | 797 | ISC has no CMM certifications. |
| 22 | 800 | Projects for which ISC was the prime contractor were significantly smaller than the FBO project. |

AR 775–800; *see also* Gov't. Mem. at 43–52 (identifying seventy-nine other weaknesses from the Majority Report). Based on the significant number of identified and unchallenged weaknesses listed above, ISC can not establish prejudice based on the two errors that the court determined did not have a rational basis.

ISC has not persuaded the court that it had "substantial chance" of being awarded the contract in light of these twenty-two weaknesses. By not meeting the "substantial chance" standard, ISC has not established that it was prejudiced by these GSA errors. *See Bannum,* 404 F.3d at 1358 ("To establish prejudice [a protestor is] required to show that there was a 'substantial chance' it would have received the contract but for [the agency's] errors in the bid process."); *see also id.* at 1353 ("The trial court [is] required to determine whether . . . errors in the procurement process significantly prejudiced [the protestor].").

### E. Plaintiff And Intervenor Are Entitled To Limited Injunctive Relief.

▮ Having determined that the procurement violated the APA and ISC and DEVIS were prejudiced, the court must determine whether ISC and DEVIS are entitled to injunctive relief.

ISC requests that the court issue a permanent injunction that:

a. Permanently enjoin[s][GSA] from performance of the contract awarded to Symplicity under Solicitation Number TQN–04–RA–0001;

b. Direct[s] GSA to reject Symplicity's proposal as late;

c. Direct[s] GSA to evaluate ISC's proposal consistent with the terms of the [S]olicitation;

d. Award[s] a contract to the offeror submitting the proposal that represents the best value to the [G]overnment consistent with the terms of the [S]olicitation; and

e. Award[s] ISC such other and further relief as this [c]ourt may deem necessary and proper.

Pl. Mot. at 3; *see also* Pl. Supp. Br. at 53 ("Plaintiff respectfully requests that, in addition to the previous remedy requests, the [c]ourt direct the [G]overnment to reject Symplicity's proposal as late and improperly included in the competitive range and to reevaluate all proposals remaining in the competitive range with a new evaluation team and source selection authority.").

DEVIS also has requested that the court issue a permanent injunction that "set[s] aside the agency's unlawful and irrational procurement action and . . . direct[s] the agency to undertake appropriate corrective action, including the elimination of Symplicity's proposal from consideration and a comprehensive review and independent determination by the SSA regarding whether the DEVIS proposal or the ISC proposal represents the 'Best Value' to the [G]overnment." Int. Mot. ¶ 7.

As a matter of law, the court has authority to award equitable relief in this case:

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

28 U.S.C. §§ 1491(b)(2), (3).

The United States Court of Appeals for the Federal Circuit, however, has held that the court is not required to set aside an arbitrary, capricious, or otherwise unlawful contract award. *See PGBA, LLC v. United States,* 389 F.3d 1219, 1226 (Fed.Cir.2004) ("We thus hold that, in a bid protest action, [28 U.S.C. § ] 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful con-

tract award."); *see also* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").

In deciding whether to issue a permanent injunction, however, the court must consider:

> (1) whether, ... the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *See Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

*PGBA,* 389 F.3d at 1228–29.

### 1. Plaintiff and Intervenor Have Demonstrated Success On The Merits As To Certain Issues.

For the court to award permanent equitable relief, the protesters must have prevailed on the merits. *See PGBA,* 389 F.3d at 1229. In this case, the court has determined that GSA has violated certain procurement regulations, *i.e.,* FAR 15.306(c) and FAR 15.308, and that ISC and DEVIS were prejudiced by these violations.

### 2. Plaintiff and Intervenor Have Established Irreparable Harm, If The Court Does Not Grant Injunctive Relief.

The second consideration is whether the protesters will suffer irreparable harm, if the court does not grant injunctive relief. *See PGBA,* 389 F.3d at 1229. When assessing irreparable injury, the relevant inquiry is whether the protesters have an adequate remedy, in the absence of an injunction. *See OTI Am., Inc.,* 68 Fed.Cl. at 659 (quoting *PGBA, LLC v. United States,* 60 Fed.Cl. at 221, *aff'd,* 389 F.3d 1219 (2004); *Overstreet*

*Elec. Co., Inc. v. United States,* 47 Fed.Cl. 728, 743 (2000)).

The United States Court of Federal Claims has held that a protester suffers irreparable injury, when it has been deprived the opportunity to compete fairly for a contract. *See Cardinal Maint. Serv., Inc. v. United States,* 63 Fed.Cl. 98, 110 (2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders.... Irreparable injury includes, but is not limited to, lost profits which would flow from the contract." (citing *Hunt Bldg. Co., Ltd. v. United States,* 61 Fed.Cl. 243, 280 (2004)) ("Actus[, the awardee,] will be harmed by having to undergo a recompetition-but not as severely as Hunt[, the losing bidder,] would be, if the unfair selection were allowed to stand. Actus will still be able to compete, this time on equal footing with Hunt, whereas absent injunctive relief, Hunt will have been unfairly denied a meaningful opportunity to compete. On balance, injunctive relief is warranted to remedy the unfair process here."); *SAI Indus. v. United States,* 60 Fed.Cl. 731, 747 (2004) ("Irreparable injury can be shown in the 'form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom.'") (quoting *Metcalf Constr. Co., Inc. v. United States,* 53 Fed.Cl. 617, 645 (2002)).

ISC and DEVIS do not have an adequate remedy other than an injunction. GSA intended to award a three-year fixed price incentive contract with the potential for an additional five option years. *See* AR 196, 206. The Solicitation encouraged offerors "to propose creative, innovative, solutions" and ISC and DEVIS' Proposals identify several optional enhancements, however, the unique features of ISC and DEVIS' Proposals make it difficult for the court to quantify the potential profit that each offeror expected to earn during the term of the contract. In addition, ISC and DEVIS each have committed substantial resources to challenge the procurement in the Government Accountability Office and the United States Court of Federal Claims. Although an award of monetary relief might compensate ISC and DE-

VIS for these efforts, in part, the denial of injunctive relief would deprive them of the opportunity to compete fairly and equally for the Contract.

### 3. In This Case, A Balance of the Hardships To The Parties Favors The Grant Of Limited Injunctive Relief.

The third consideration is whether the balance of hardships to the respective parties favors the grant of injunctive relief. *See PGBA,* 389 F.3d at 1229. Injunctive relief, in this case, would delay GSA's effort "to acquire a contractor for comprehensive development, implementation, transition, operations[,] and support of a new Federal Business Opportunities (FBO) system." AR 89. To be sure, an injunction requiring GSA to reevaluate the offerors' Proposals in accordance with the applicable laws and regulations and the terms of the Solicitation would impose additional time and expense on the agency. On the other hand, during this post-award bid protest the FBO system has remained in operation with the incumbent contractor's assistance. GSA has not indicated to the court that a further delay in awarding the contract might threaten the continued operation of that system.

Moreover, although the Administrative Record indicates that ISC is a small business, the court does not have sufficient information to ascertain any hardships that either ISC or DEVIS would suffer absent a grant of injunctive relief. *See* AR 2. And, to date, neither party has expressed a desire to supplement the Administrative Record with such evidence. Nevertheless, it is clear that, absent an award of injunctive relief, both ISC and DEVIS would lose the opportunity to compete on a fair basis for this contract.

Given the minimal impact on GSA of an award of injunctive relief in favor of ISC and DEVIS, the balance of the hardships favors the grant of injunctive relief. If the interim viability of the FBO website was in question, granting injunctive relief might be improvident. The additional time and expense involved in requiring GSA to reevaluate the offerors' Proposals is outweighed by the importance of allowing ISC and DEVIS the opportunity to compete fairly for this contract.

### 4. In This Case, The Public Interest Weighs in Favor of Limited Injunctive Relief.

The final consideration is whether it is in the public interest to grant injunctive relief. *See PGBA,* 389 F.3d at 1229. Although the grant of injunctive relief will further delay GSA's procurement of a new contract, any such delay is outweighed by the public interest in ensuring that the ultimate awardee offers the "best value" to the Government and that the GSA complies with the terms of the Solicitation and the applicable procurement regulations.

It has long been understood that the public interest is served by an injunction that is designed to ensure that the procurement process is conducted pursuant to law. *See, LABAT–Anderson, Inc. v. U.S.,* 65 Fed.Cl. 570, 581 (2005) ("It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations.") (citations omitted); *see also Hunt Bldg.,* 61 Fed.Cl. at 280 ("Plaintiff has shown that granting a permanent injunction will serve the public interest by ensuring that the selection process under this Solicitation is conducted fairly. Otherwise, the Air Force's violations would have the adverse effect of undermining the integrity of the competitive process for privatizing military housing. In granting injunctive relief, public confidence in that process will be preserved.") (citations omitted); *SAI Indus.,* 60 Fed.Cl. at 747 ("The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts. Robust competition ensures that the costs to the taxpayer will be minimized. Additionally, granting this injunction will ensure that this procurement is conducted according to all applicable procurement laws and regulations.") (citing *Metcalf Constr.,* 53 Fed.Cl. at 645); *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. 502, 521 (2003) ("[T]he public interest is served by enforc-

ing a procurement process that conforms with regulatory authority and the solicitation's evaluation criteria.") (citing *Essex Electro Eng'rs, Inc. v. United States,* 3 Cl. Ct. 277, 288 (1983)).

Therefore, the court has determined that a permanent injunction directing GSA to reexamine the Proposals submitted in response to the Solicitation and comply with the terms of the Solicitation and the applicable procurement regulations is in the public interest.

## IV. CONCLUSION.

For the aforementioned reasons, Plaintiff's Motion for Judgment on the Administrative Record and DEVIS' Motion for Judgment on the Administrative Record are hereby GRANTED. In addition, the court GRANTS Plaintiff's and DEVIS' requests for injunctive relief, as follows:

1. The General Services Administration's December 7, 2005 award of Contract No. GST00T05NSC0002 is hereby set aside.

2. If the General Services Administration would like to proceed with this procurement, it is hereby ordered to appoint a new Source Selection Authority to review the Proposals received in response to Request for Proposals No. TQN–04–RA–0001, pursuant to the Solicitation's terms and conditions and applicable FAR regulations, and to select that offeror for award deemed to represent the best value to the procuring agency.

The Clerk of the United States Court of Federal Claims is **DIRECTED** to enter judgment in accordance with this Memorandum Opinion and Final Order.

**IT IS SO ORDERED.**